STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
McCOY WHITAKER, DEFENDANT-RESPONDENT.

Argued March 6, 1979—Decided May 8, 1979.

*Mr. Kenneth N. Lipstein,* Deputy Attorney General, argued
the cause for appellant (*Mr. John J. Degnan,* Attorney
General of New Jersey, attorney).

*Mr. Jeffrey P. Blumstein,* Designated Counsel, argued the cause for respondent (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

The opinion of the court was delivered by

HUGHES, C. J. On the petition of the State, we granted certification of a decision by the Appellate Division which had modified sentences imposed upon a defendant convicted after jury trial of numerous serious offenses. This appellate action was predicated on a conclusion that such sentences were "unduly harsh and punitive and justice will best be accomplished by some modification." On this basis the appellate court imposed, as is procedurally accommodated by *R.* 2:10–3, the sentence which it thought "should have been imposed." We think the Appellate Division fell into grave error in so doing, and we reverse.

## I.

## THE OFFENSES, THE COURSE OF PROSECUTION AND THE SENTENCES IMPOSED

During the late evening of December 30, 1975, while the victims, Mr. and Mrs. "C," were peaceably in their home,[1] the defendant and two accomplices forced an entrance thereto, brandishing knives and threatening death to the occupants. They raped the female victim and inflicted other unspeakable assaults upon her which need not be described here. They so choked and brutalized Mr. "C" as to seriously and most likely permanently damage his larynx, including binding his throat by a necktie and pulling him from room to room in their search for booty. They ripped off wall telephones, imprisoned their victims, took care to obliterate fingerprints

---

[1] This Court has had occasion to emphasize the sanctity of the home as distinguished from the street and other public places within reach of police or citizen protection from personal violence. *State v. Christener,* 71 *N. J.* 55, 74 (1976).

(one, that of defendant, survived), and stole all the money they could lay their hands on or extort, as well as a television set, watches and items of jewelry. At the end of this reign of terror they left, and later the victims were found and released by a neighbor.

Mrs. "C" identified defendant as the person who had raped her and he admitted as much in a police statement. Later in his trial testimony, as the jury verdict established, he falsely denied that factor of participation. Yet his defense counsel would suggest to the sentencing judge, in mitigation, the candor of the defendant in admitting in his testimony at least a limited participation in the criminal events involved.

The judge who had presided over the trial of defendant for some five days, had observed all witnesses and had heard and recorded the jury's verdict convicting the defendant of various offenses, then faced the responsibility of imposing sentence. The defendant by this time had enjoyed, as he should have, the fair public trial guaranteed him by the Sixth Amendment to the Constitution of the United States. Because indigent, he had been defended with competence (the record does not suggest otherwise) by the Public Defender, also appropriately his right under the law. *N. J. S. A.* 2A:158A–5. He had been advantaged by a presentence investigation, *R.* 3:21–2, in which any mitigating factors could be advanced. It is difficult to imagine any other advantage or benefit which could have been afforded this defendant by the administration of justice, or suggested by rights of constitutional origin.

Defendant had previously been characterized, in a 1973 diagnostic evaluation relating to a juvenile delinquency charge involving violence, as "highly predisposed toward asocial behavior patterns." The trial judge was entitled to find as he did that defendant represented an imbedded threat to the peaceful community.

In this posture then, the trial court proceeded to impose sentence, a societal and legal imperative. The defendant had been convicted and sentences were imposed, as follows:

Count One — Entering with intent to rob (*N. J. S. A.* 2A:94–1)
Not less than 3 nor more than 4 years in the New Jersey State Prison, consecutive to the sentence to be imposed on Count Six.
Count Two — Robbery (*N. J. S. A.* 2A:141–1)
A minimum of 9 and a maximum of 12 years, concurrent with sentence to be imposed on Count Six.
Count Three — Robbery while armed (*N. J. S. A.* 2A:151–5)
A minimum of 5 and a maximum of 7 years, concurrent with sentence to be imposed on Count Six.
Count Four — Robbery (*N. J. S. A.* 2A:141–1)
Not less than 9 nor more than 12 years, consecutive to the sentence to be imposed on Count Six.
Count Five — Robbery while armed (*N. J. S. A.* 2A:151–5)
Not less than 5 nor more than 7 years, consecutive to the sentence to be imposed on Count Six.
Count Six — Rape (*N. J. S. A.* 2A:138–1)
Not less than 26 nor more than 27 years.

There was a certain rationality to these sentences so far as separation of offenses was concerned. Having entered the home violently, with intent to rob, defendant and his accomplices could have abandoned that intent and need not have committed the actual robberies, distinct and separate offenses. Having committed the robberies, they need not have raped and sexually brutalized their female victim, nor need they have physically abused the male victim. There is, of course, no suggestion of legal merger of the separate and successive offenses of which defendant was convicted. The sole question presented to us is the alleged excessive character of the sentences and the propriety of the Appellate Division disapproval and reduction thereof.

Under present law, the consecutive sentences thus imposed are "aggregated." *N. J. S. A.* 30:4–123.10 provides:

Whenever, after the effective date of this act, 2 or more sentences to run consecutively are imposed at the same time by any court of this State upon any person convicted of crime herein, there shall be deemed to be imposed upon such person a sentence the minimum of which shall be the total of the minimum limits of the several sentences so imposed, and the maximum of which shall be the total of the maximum limits of such sentences. For purposes of determining the date upon which such a person shall be eligible for consideration for release on parole, the board shall consider the minimum sen-

tence of such person to be the total aggregate of all the minimum limits of such consecutive sentences and the maximum sentence of such person to be the total aggregate of all of the maximum limits of such consecutive sentences.

Thus, for parole consideration purposes, the minimum of the sentences imposed by the trial judge totals 43 years and the maximum 50 years. That such was the sentencing judge's intention is evident from the transcript of his remarks at sentence: "* * * making a total of not less than 43 and not more than 50 years in the State Prison at Trenton."

On the basis of its conclusion that this disposition was "unduly harsh and punitive," the Appellate Division decided that the consecutive sentences should instead run concurrently with the principal sentence imposed, that for rape, of not less than 26 nor more than 27 years. Accordingly, this divergence of opinion involves the judicial function of the trial judge in imposing sentences aggregating 43 to 50 years, and that of the Appellate Division fixing such aggregate sentences at 26 to 27 years.

As bearing upon the potential of these sentences for actual incarceration, it must be noticed that a prisoner serving a minimum-maximum term in the New Jersey State Prison is entitled by law to remission of time for the carrying out of work assignments ("work time"), such credits being graded upward if the prisoner is sufficiently trustworthy to be classified in minimum security and be employed on "honor" details. *N. J. S. A.* 30:4–92. Additionally, progressive time credits are allowed for good behavior ("good time"). *N. J. S. A.* 30:4–140. As a first (adult) offender, defendant would become eligible for consideration for release on parole after serving his minimum sentence or one-third of his maximum sentence, less the good behavior and work credits mentioned. *N. J. S. A.* 30:4–123.10.

Counsel for the parties indicated at argument before us that in this posture defendant could become eligible for consideration for release on parole, under the Appellate

Division sentence, on May 21, 1982, or about three years hence. Under the trial court sentence, he would reach this eligibility date on April 15, 1987, or about eight years hence. This potential of release on parole, and of course it is only a potential, is nevertheless relevant to the needful period of incapacitation of the defendant if that factor is important, and we hold that it is, to the protection of the peaceful community from further violent assault.

We proceed to examine the judicial discretion exercised by the courts involved, with respect to the sentences imposed and then reduced.

## II.

### THE "REASONS" FOR SENTENCE AND ITS REDUCTION

In New Jersey a judge imposing sentence must state his reasons therefor on the record. *R.* 3:21-4(e) ; *R.* 7:4-6(c). Similarly, reasons must be stated for a reduction of sentence or denial of a motion therefor under *R.* 3:21-10. *State v. Tumminello,* 70 *N. J.* 187, 194 (1976). As there stated by Justice Clifford:

At least some of the underlying policy considerations which favor the furnishing of reasons on sentencing are equally applicable to a change of sentence: to provide an appellate court with the means by which to review a decision on sentencing * * *. [*Id.*]

This salutary goal is not attainable if the reasons stated are routine or "boilerplate." *See State v. Sanducci,* 150 *N. J. Super.* 400, 403 (App. Div. 1977). "In fixing a sentence a judge should consider the gravity of the crime and appropriate punishment therefor, deterrence, protection of the public, rehabilitation and any other factors or circumstances relevant * * *." *State v. Jones,* 66 *N. J.* 563, 568 (1975). It is obviously impossible for appellate review to ascertain with maximum certitude the justification or otherwise for a given sentence, if the purposes of the judge in imposing it (his

"reasons"), and therefore its correctness, are not so illuminated.

In this case the trial judge stated at the foot of the judgment record: "Reasons for sentence imposed: State recommendation; circumstances surrounding offense; custodial supervision needed; deterrence to others and himself; unable to comport with society; poor rehabilitation risk."

These reasons were amplified by an extended statement on the record by the trial judge before imposing sentence. It is convincing to us that he gave most careful and conscientious weight to all of the factors described by Justice Sullivan for this Court in *Jones, supra. Inter alia,* the trial judge here stated:

> * * * [I]n fixing a sentence a judge should consider the gravity of the crime or crimes, and appropriate punishment therefor, deterrence, protection of the public, rehabilitation if any, and any other factors or circumstances relevant * * *. * * * [T]he judge must also consider the offender himself, the age, background, social adjustment, his attitude, personality traits, his physical, emotional and mental condition, and his past record. Some crimes call for a minimum period of confinement, as well as a maximum sentence. Not because of a desire to punish the defendant, but the Court should consider what is in the best interests of the defendant and the community.
>
> The judge must consider the deterrent effect of a prison sentence, not only on the defendant, but also on other potential offenders.

After having reviewed the fact that the presentence report reflected involvements as a juvenile, including offenses of violence, the judge commented:

> His behavior throughout most of his life from what the Court can gather has been antisocial. He has not been able to adjust while free in the community. And from the Court's observations * * * his criminality appears to have been escalating at an early age. The offenses here involved were serious and contained clear potential for violence; and in fact, did result in violence after the initial entry into the home was effected.
>
> The crime of entering with intent to rob while armed, and rape were committed while the perpetrators had knives. The defendant at this young age — and I find him to be a poor risk. There is

nothing in his background that would indicate any chance for improvement * * *. * * * [I am] satisfied there has to be a custodial supervision in this case, and a lengthy one.

The concept of punishment may be repugnant, but society must be protected from dangerous offenders. * * *

The sentence that the Court is going to impose today is not one of casual consideration. The sentence is to warn others that crimes of this nature will be dealt with severely. The defendant's guilt is manifestly apparent on the record. * * * [T]his was a situation that developed where three individuals set upon two unwary, unsuspecting people in their own home. This was calculated. This was cold blooded, even at an early age of 19 years old.

* * * *

During the course of the trial, during which both victims testified four times, two times during the *Wade* hearing, and two times during the actual trial, I observed the victim whose larynx has now been affected by the injuries that were inflicted upon him during the course of that robbery where they put a tie around his neck and dragged him from room to room. I saw two people whose lives had been virtually destroyed[2] * * *. * * * A society which is based on freedom and peace cannot allow those who will not abide by the rules to interfere with the rights of those who will.

It is the Court's intention in this case to inflict a State Prison [sentence] upon this defendant. I am not sending him to the reformatory because I feel the crimes themselves are so serious and heinous that a reformatory sentence would not be proper and fit in this particular case because of the seriousness of the offenses, the indignities inflicted upon the individuals, the callousness with which the offenses were committed, all indicating that there has to be a State Prison sentence, and consecutive, and not concurrent to each other in most cases.

I heard the testimony. * * *

Much else was mentioned by the sentencing judge, including his consciousness of the social evaluation, the predisposition of defendant to asocial behavior, his failure on strict probation and mental health counseling. The court doubted the possibility of effective rehabilitation, and believed

---

2Here the judge apparently recognized the inevitable psychological consequences, arising not only from the terror experienced by the ravished wife, but also the degradation and humiliation of a husband, helpless in the grip of brutal force to do other than suffer her defilement.

that the "passing of time would bring about more serious offenses." (We believe that the court's action in designating the State Prison as the place of confinement rather than a reformatory, despite the comparative youth of defendant, was not only appropriate under the statutes but a wise exercise of discretion in a case of this nature. We do not intend to be understood as abandoning the philosophy as to youthful offenders in general, as discussed in cases such as *State v. Spinks,* 66 *N. J.* 568 (1975) and *State v. McBride,* 66 *N. J.* 577 (1975).)

By contrast, the Appellate Division, while conceding the heinous nature of the crimes, gave predominant attention to the offender, his borderline intelligence, social maladjustment and yearning for "achievement." A psychiatric examination conducted for sentencing purposes established that defendant seeks "socially unacceptable modes of achievement, *e. g.* robbery," and recommended that he be "handled correctionally," a factor carefully considered by the sentencing court.

As bearing upon its ultimate conclusion that the sentence was unduly harsh and punitive and that "justice will best be accomplished by some modification," we discern no reference by the Appellate Division to the protection of the community from violence, to concern for the unfortunate victims, to the purpose of deterrence of others, to the dim prospect of rehabilitation of the defendant, or other particular bases announced by the sentencing judge as supportive of his exercise of discretion. While it is quite possible that the appellate court had these factors in mind, its lack of articulation of its reasons for overthrowing, as a manifest abuse of his discretion, the judgment of the sentencing judge makes it impossible to justify the appellate action for which such a finding was prerequisite. As recently pointed out for this Court by Justice Pashman in *State v. Leggeadrini,* 75 *N. J.* 150, 156–57 (1977):

The imposition of an appropriate sentence is entrusted to the sound discretion of the sentencing judge. Thus, the scope of appellate review is normally limited to the question of whether that discretion

has been abused by the imposition of a sentence which is manifestly excessive under the particular circumstances of the case.

In restating in that case the mandate that "sentencing judges consider aggravating and mitigating circumstances with respect to both the offender and the offense," we emphasized the need that reasons for the particular disposition must be set forth for "appellate evaluation." *Id.* at 157. As we have indicated, the decision of the Appellate Division was deficient in this respect. A court's legitimate consideration of the offender, *qua* offender, as well as the offense itself was mentioned by us recently in *State v. Marzolf,* 79 *N. J.* 167 (1979).

While there were other purposes for the adoption of our "reasons" rule, *R.* 3:21–4(e); *R.* 7:4–6(c) (such as inducement to the judge to more carefully prepare himself for the solemn and grave responsibility of sentencing a fellow human being to loss of liberty), the aid to appellate evaluation was a principal purpose. Therefore it is quite clear that a similar imperative rests upon an appellate court for explication of its rationale in undertaking to reduce a sentence, where further appellate review of its action may be had, as provided by law.

## III.

### *THE APPELLATE ROLE AS TO SENTENCE*

While an appellate court has, and of course must have, the power to modify any criminal sentence that is manifestly excessive, even when it is within statutory limits, *State v. Leggeadrini, supra; State v. Bess,* 53 *N. J.* 10, 18 (1968); *State v. Laws,* 51 *N. J.* 494, 509–10 (1968), the power is one which should be exercised sparingly and only upon a "clear showing of abuse of discretion." *State v. Velazquez,* 54 *N. J.* 493, 495 (1969). In *Velazquez,* Justice Jacobs noted the reference in a civil case, *Schuttler v. Reinhardt,* 17 *N. J. Super.* 480, 485 (App. Div. 1952), that:

"We would emphasize that it is only in the exceptional case that a discretionary act will lead to a reversal. The circumstance that the appellate judges, had they been presiding at the trial, would have made a contrary ruling, is far from enough to bring about a reversal." [54 *N. J.* at 495 (Jacobs, J. *concurring*)].

And even in *Schuttler*, Judge Bigelow expressed concern about the amorphous nature of the term "abuse of discretion." 17 *N. J. Super.* at 485. Appropriate precision is embodied in the norm stated in *Leggeadrini, supra*, which we have quoted, such as by its association, causatively, of abuse of discretion and the imposition of a "manifestly excessive sentence." Yet it may be timely now for this Court to sharpen even this definition by comparisons with the rule on the civil side of the law, limiting the appellate role, in order to cope with the natural temptation of reviewing judges to substitute their subjective views for the judgment of a jury or other trier of fact. This would seem particularly needful because of the marked proliferation of appeals from allegedly excessive sentences. More than 20 percent of Appellate Division appeals from criminal convictions involve claimed excessiveness of sentence. It would appear from the statistics that most of these appeals are unsuccessful on this ground. In the court year ending August 1977, 628 such appeals were filed of which 30 were successful. *Administrative Director of the Courts, Annual Report* 1976–77, B33. In the court year ending August 1978, 652 such appeals were filed of which 41 were successful. *Administrative Director of the Courts, Statistical Supplement to the Annual Report* 1977–78, B33. This proportion would seem to indicate a proper circumspection on appellate approach to revising sentences imposed by the trial judge. And so that such circumspection may be institutionalized, so to speak (and taking into consideration that constitutional concerns are of surpassing importance in the criminal process), we think it appropriate to suggest that appellate courts should have in mind the safeguards erected on the civil side of the law, as to interference with the judgment expressed on the trial level.

These strictures upon appellate supervision have been expressed in various ways, all oriented to the concept of a clear and compelling finding of a miscarriage of justice. In *Sweeney v. Pruyne,* 67 *N. J.* 314 (1975), for instance, and in *Taweel v. Starn's Shoprite Supermarket,* 58 *N. J.* 227 (1971), the rule was put in terms of such shock to the judicial conscience as to be convincing that upholding the action reviewed would be "manifestly unjust." 58 *N. J.* at 236. Our rule limiting judicial interference with a jury verdict forbids it unless it "clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a).

In *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N. J.* 474 (1974), we had occasion to review the limited scope of appellate review of basic trial level findings, as follows:

[O]ur courts have held that the findings on which it is based should not be disturbed unless "* * * they are so wholly insupportable as to result in a denial of justice," and that the appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter. *Greenfield v. Dusseault,* 60 *N. J. Super.* 436, 444 (App. Div. 1960), aff'd o.b. 33 *N. J.* 78 (1960). That the finding reviewed is based on factual determinations in which matters of credibility are involved is not without significance. *Brundage v. New Jersey Zinc Co.,* 48 *N. J.* 450 (1967). Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence. *New Jersey Turnpike Authority v. Sisselman,* 106 *N. J. Super.* 358 (App. Div. 1969), certif. den. 54 *N. J.* 565 (1969). It has otherwise been stated that "our appellate function is a limited one: we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," *Fagliarone v. Twp. of No. Bergen,* 78 *N. J. Super.* 154, 155 (App. Div. 1963), and the appellate court therefore ponders whether, on the contrary, there is substantial evidence in support of the trial judge's findings and conclusions. *Weiss v. I Zapinsky, Inc.,* 65 *N. J. Super.* 351, 357 (App. Div. 1961). [65 *N. J.* at 483–84].

There is much logical force to the recommendation of appellate restraint in disrupting a jury verdict, the presumptive correctness of which has behind it "the wisdom of

centuries of common law merged into our constitutional framework." *Baxter v. Fairmont Food Co.,* 74 *N. J.* 588, 598 (1977). A similar respect is due the judgment of the initial fact finder in non-jury cases. *Leimgruber v. Claridge Assoc.,* 73 *N. J.* 450 (1977); *State v. Johnson,* 42 *N. J.* 146, 162 (1964). In the latter case, Justice Hall closely examined this principle, quoting Brochin and Sandler, "Appellate Review of Facts in New Jersey, Jury and Non-Jury Cases," 12 *Rutgers L. Rev.* 482, 484–85 (1958), as follows:

"New Jersey courts under the new system have held that findings of fact made by trial judges in non-jury cases must be affirmed if amply supported by the evidence; or by competent, reasonably credible evidence; that such findings are entitled to great weight on appeal; that they are entitled to every intendment in their favor and must not be reversed merely because a doubt is raised; that they must not be set aside unless so plainly unjustified by the evidence that interests of justice necessitate their nullification; or unless in conflict with the preponderating proofs; or so manifestly unsupported by or discordant with competent, relevant, and reasonably credible evidence as to offend the interest of justice." [42 *N. J.* at 160].

These commentators therefore emphasized that "[T]he trial judge or the jury is * * * the primary trier of fact * * * [T]he deference which appellate courts must accord such findings should be determined by considerations of policy and practicality." Brochin and Sandler, *supra* at 484.

The considerations of "policy and practicality" referred to are importantly rooted in what is sometimes called the "feel of the case" factor mentioned in *State v. Johnson, supra.* The appellate tribunal "should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy," 42 *N. J.* at 161, since it depends rather upon the cold appellate record. And while the trial court's factual judgment is never sacrosanct, so as to permit the perpetuation of a clear and identifiable miscarriage of justice, judges, including

appellate judges, are admonished to resist the natural temptation to substitute their judgment for that of the jury, as though in the role of a "thirteenth juror." *Baxter v. Fairmont Food Co., supra,* 74 *N. J.* at 597; *Dolson v. Anastasia,* 55 *N. J.* 2, 6 (1969).

As suggested by Justice Pashman in *Leggeadrini, supra,* there would seem to be no logical reason why these rules of restraint, so frequently projected in civil judgment appeals, should not apply as well to review of the basic discretion of the trial judge in the matter of criminal sentence. As he stated there:

> Appellate deference to the discretionary decision of a sentencing judge is similar, in purpose and origin, to that accorded decisions of a trier of fact. It is based primarily on the sentencing judge's presumed superior ability to make a first-hand evaluation of the background and character of the defendant and the offense. [75 *N. J.* at 162].

In his review of the purposes of sentencing in *State v. Ivan,* 33 *N. J.* 197 (1960), Chief Justice Weintraub took occasion to quote from the comment to the Model Penal Code (Tentative Draft No. 2, May 3, 1954) as follows:

> * * * The Section is drafted in the view that sentencing and treatment policy should serve the end of crime prevention. It does not undertake, however, to state a fixed priority among the means to such prevention, *i. e.,* the deterrence of potential criminals and the incapacitation and correction of the individual offender. These are all proper goals to be pursued in social action with respect to the offender, one or another of which may call for the larger emphasis in a particular context or situation. [33 *N. J.* at 201].

The variables mentioned in *Ivan* as suggesting primary attention to the offender *vis-a-vis* the offense, or those recapitulated in *Leggeadrini, supra,* do not exist in the present case, except perhaps as to the age of the offender, 19 years. Here there was no crime " 'steeped in emotional pressures' " or one comprising, in an otherwise blameless life, an " 'isolated excursion beyond the pale of the law induced by en-

gulfing circumstances,' " *State v. Leggeadrini, supra,* 75 *N. J.* at 158; but on the contrary a "cold-blooded" criminal venture, as was observed by the sentencing judge. Here there was not, as in *Leggeadrini,* "an unlikely recidivist * * * already * * * punished by his continuing deep remorse" or one whose acknowledgment of wrongdoing would seem "conducive to rehabilitation." *Id.* at 160. On the contrary.

The sentencing judge here very "properly [gave] paramount concern to the magnitude of the crime and the deterrence of others rather than to the attributes of the offender" and thus he appropriately fashioned a sanction which "will neither diminish the gravity of the offense nor embolden would-be criminals to act with any expectation of leniency or impunity." *Id.* at 158.

The judgment of the Appellate Division is reversed and the sentences imposed by the trial judge are reinstated.

PASHMAN and HANDLER, J.J., concurring in the result.

*For reversal*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For affirmance*—None.