STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. RAMON
PEREZ, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued July 29, 1980—Decided August 15, 1980.

294

Before Judges KING, FRANCIS and GREENBERG.

*Pamela D. Hayes,* Assistant Deputy Public Defender, argued the cause for appellant (*Stanley C. Van Ness,* Public Defender, attorney; *Lois De Julio,* Assistant Deputy Public Defender, of counsel; *Elizabeth Brannan,* Assistant Deputy Public Defender, on the brief).

*Harvey B. Lester,* Assistant Essex County Prosecutor, argued the cause for respondent (*John J. Degnan,* Attorney General of New Jersey, attorney; *Donald S. Coburn,* Essex County Prosecutor, of counsel; *Robert M. Schaaf,* Assistant Essex County Prosecutor, on the letter brief).

The opinion of the court was delivered by

KING, P. J. A. D.

Defendant pleaded *non vult* to the charge of murder (*N.J.S.A.* 2A:113–1, 2) and received a life sentence. He appeals pursuant to *R.* 3:5–7(d), contending that the judge of the Law Division improperly denied his motion to suppress damning evidence, an 007 knife and a black leather jacket, seized incident to his arrest without a warrant on October 7, 1976 at about 1:30 a. m. in his apartment in Newark. Defendant contends that the arresting

officers did not have probable cause to apprehend him and that the fruits of the seizure incident to his unlawful arrest should have been suppressed. We conclude that the arresting officers did have probable cause to act under the exigent circumstances and affirm.

Three witnesses testified at the suppression hearing at which the State had the burden of justifying the warrantless arrest and the consequent seizure of the murder weapon and the jacket. *State v. Whittington*, 142 *N.J.Super.* 44, 52 (App.Div. 1976). The murder occurred at about 7:30 p. m. on October 5, 1976. The body of the victim, Carmen Pabon, was found behind the Old Essex House Hotel in Newark shortly thereafter. There were seven stab wounds on the body.

Detective Percell Goodwin of the Newark Homicide Squad was assigned with two other detectives to the investigation at 11 a. m. on October 6. He was told that the body of a young Puerto Rican male had been found "behind the Old Essex House Hotel with multiple stab wounds." At about 7:30 p. m. on October 6 Goodwin and the two other detectives went to meet a prospective informant who had called police headquarters earlier that day claiming to have information about the murder. Goodwin met the informant, Angel Tirado, at the assigned rendezvous, a Howard Johnson motel parking lot on Routes 1 and 9 by the Newark airport at about 8 p. m. Tirado was not known to the police prior to this time. Goodwin said that Tirado told him that "the Perez boys had killed Carmen Pabon. He [Tirado] gave me the name of Israel [Popo] Perez, Cheeto Perez [the defendant] and he gave me the name of a fat kid. He did not know his last name but he told me he had escaped from the Youth House. He said he received this information from a friend." The friend was identified as Angel Garcia, also unknown to the police. The informant, Tirado, told the police "that Israel and the fat kid had held Carmen Pabon while Cheeto [the defendant] had stabbed" the victim. Garcia told Tirado that defendant himself admitted to Garcia that he did

the killing and actually showed him the murder weapon, the 007 knife. Tirado was also told by Garcia that defendant had been wearing "a long black leather coat" at the time of the murder.

A police record check on the suspects at headquarters did not turn up their correct full names or addresses. Goodwin stated the officers "went back on the streets. We started looking for people and informants." They returned to headquarters at 10:30 p. m., the investigation temporarily stymied. While at headquarters they spoke with an undisclosed informant who had given Goodwin reliable information about 10 to 15 times in the past which had led to arrests in narcotics investigations. This informant confirmed the Tirado tip that the two Perezes and the "fat guy" committed the murder. This informant established the real identity of the suspects, giving their correct names, i. e., Israel (Popo) Perez, Ramon (Cheeto) Perez and Alberto (Fat Guy) Amberez. The correct names of the defendant and Amberez had not been known to the police until this time. The informant also gave the detectives the Perezes' address at 77 Lincoln Park and said that Amberez lived "on Broadway." A record check then disclosed Amberez's present address as 33 James Street but did reveal that his previous address was on Broadway.

At about 12:30 a. m. on October 7 Goodwin and his two partners went to 33 James Street. Alberto Amberez's mother answered the door. She confirmed that he lived there but said "she hadn't seen him in a couple of days." She consented to a search of the apartment which was unproductive.

Thereafter at about 1:30 a. m. the detectives went to 77 Lincoln Park, an apartment building. The superintendent took them to the Perez' fourth floor apartment. A woman answered the door, the police identified themselves and in response to a question she revealed that her sons Ramon and Israel Perez were in bed asleep. Goodwin testified that the woman "directed us to the bedroom. She motioned for us to come in. We went inside and closed the [front] door and she directed us to the

bedroom." She turned the lights on as the police entered the bedroom. Four people, including the three suspects, were asleep in two beds. On the foot of one bed in open view lay a long black leather jacket and an 007 knife. A gun was protruding from beneath defendant's pillow. The three suspects were awakened and arrested; the evidence was seized.

At some point during the investigation the police verified that there was an outstanding arrest warrant for "the fat guy," Alberto Amberez, for escape from the Training School at Jamesburg. Unfortunately, the record does not disclose whether the existence of the warrant was first known to the arresting officers before they entered the Perez apartment.

The State also called the original informant, Angel Tirado, as a witness. He testified that he was in the vicinity of the Old Essex House Hotel at the time of the murder. He said that "when the three fellows found the guy they were friends of mine, too. I went back there and I looked and there was the body lying on the ground." Tirado did not know the victim. At about 1 p. m. on October 6, the day after the murder, Tirado's friend of ten years, Angel Garcia, told Tirado of defendant's admission of complicity and of the details of the murder. Tirado said he was moved to call the police after seeing the body and securing the details of Perez' complicity from Garcia because "I used to hang around with these guys and then my brother started hanging around with these guys, too, see, and I started thinking the next victim could be me or any of my brothers or anybody else could get hurt by these guys if they get away with it."

Tirado described calling the police and arranging the meeting at the motel parking lot. He "told them what [Garcia] told me," i. e., "that Cheeto [Romon] had the knife and he stabbed the guy a couple of times and Israel [Popo] held the guy and the fat kid [Amberez, also called Fatso] went back and stabbed the guy a couple of times, too." Tirado told the police that defendant used an 007 knife and wore a long black leather jacket at the time of

the murder, according to Garcia's statement. Tirado also identified himself to the police at the time of the October 6 parking lot meeting.

Defendant called Carmen Perez, defendant's mother, as the sole defense witness at the suppression hearing. She said that when she opened the door the detectives "pushed me to the side and they went in" without speaking or producing identification. Her testimony explicitly rejected Goodwin's contention that she voluntarily motioned the detectives inside and willingly led them to the suspects' sleeping quarters. She denied seeing any gun or knife that night. The Law Division judge implicitly disregarded Carmen Perez's testimony as unworthy of belief. On this record he was certainly entitled to do so.

■ The Law Division judge found as a fact that the police had probable cause to arrest defendant in the bedroom of the Lincoln Park apartment and that the seizure of the gun, the 007 knife used in the murder and the incriminating black leather jacket, was reasonably incident to the lawful but warrantless arrest. The judge found that Tirado was "a private citizen informant" and that the second informant was reliable based on his past performance. The judge also found that circumstances were exigent, with the likelihood that the "suspects would abscond if not swiftly apprehended." He also concluded that "the entry and search were made peaceably" and that the gun, knife and coat were in "plain view" when seized. The Law Division judge's findings of facts were adequately supported by the record and will not be disturbed by this court. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 483–484 (1974); *State v. Johnson*, 42 *N.J.* 146, 161 (1964).

■ As our Supreme Court has stated in *State v. Fariello*, 71 *N.J.* 552, 568 (1976), this jurisdiction "follows the common law of arrest, which permits a police officer to effect a warrantless arrest when he has probable cause to believe that a crime has been or is being committed and that the person to be arrested has committed or is committing it." Defendant's arrest at 1:30

a. m. in his apartment bedroom was unquestionably the product of good police work. When he was arrested the Homicide Division detectives clearly had probable cause to believe he was involved in Pabon's murder. The tip from the disclosed citizen informant, Tirado, was entitled to some credence, especially since he was not an anonymous, faceless hireling from the criminal milieu but a concerned citizen who actually testified at the suppression hearing. *State v. Lakomy*, 126 *N.J.Super.* 430, 435 (App.Div.1974); *State v. Canola*, 135 *N.J.Super.* 224, 229–230 (App.Div.), certif. den. 69 *N.J.* 82 (1975); *Commonwealth v. Martin*, 6 *Mass.App.* 858, 381 *N.E.*2d 1114, 1117 (App.1978); *Commonwealth v. Grammo*, —— *Mass.App.* ——, 395 *N.E.*2d 476, 480 (App.1979); *see* 1 *LaFave, Search and Seizure*, § 3.4(a) at 587 (1978). Tirado's information was generally confirmed by the nondisclosed but previously reliable informant who was also able to supply the three suspects correct complete names and the Perez brothers' address. The information known to the police about the manner of commission of the crime also tended to corroborate Tirado's information.

■ Accepting Detective Goodwin's version of Carmen Perez' cooperation in allowing the detectives entry into the apartment and leading them to the sleeping suspects' bedroom, as the Law Division judge did, the detectives were legally in location to see the damning evidence, the 007 knife and the long black leather jacket, in plain view. No search was necessary. *See State v. Ercolano*, 79 *N.J.* 25, 35 (1979); *e. g., Alderman v. United States*, 394 *U.S.* 165, 177 n. 10, 89 *S.Ct.* 961, 968 n. 10, 22 *L.Ed.*2d 176 (1969); *Harris v. United States*, 390 *U.S.* 234, 236, 88 *S.Ct.* 992, 993, 19 *L.Ed.*2d 1067 (1968). Once the evidence was observed, the police had no alternative but to awaken defendant and the other two suspects and effect the arrest.

The detectives had a right to be in the bedroom at the time they observed the incriminating evidence in plain view. They had been invited into the apartment and shown to the bedroom by a tenant. Once they saw the 007 knife and the black leather

coat the investigative trail had culminated with strong reason to believe that defendant had participated in the Pabon homicide. At the time of arrest the police had more than simply the hearsay tip from Tirado, the disclosed informant, and the additional information supplied by the undisclosed informant. Under *Aguilar v. Texas*, 378 *U.S.* 108, 84 *S.Ct.* 1509, 12 *L.Ed.*2d 723 (1964), and *Spinelli v. United States*, 393 *U.S.* 410, 89 *S.Ct.* 584, 21 *L.Ed.*2d 637 (1969), this second–hand information with questionable corroboration may not have been enough to justify defendant's arrest. But the detectives also had the information about the crime and they could observe the incriminating knife and jacket. We therefore conclude that the cumulative effect of all of the information known to the detectives at the time of the arrest was adequate to justify the probable cause standard.

We do not deem *Payton v. New York*, 445 *U.S.* 573, 100 *S.Ct.* 1371, 63 *L.Ed.*2d 639 (1980), decided April 15, 1980 (forced entry of home without a warrant to arrest or search improper), as pertinent to our deliberations here. The *Payton* holding was clearly limited to nonexigent circumstances where the police had ample time to obtain an arrest warrant. Here, when the investigative trail ripened into probable cause at defendant's bedside, with the incriminating evidence in plain view, the exigencies required arrest, not retreat to obtain a judicial warrant for arrest. Further, to the extent that *Payton* could bear possible relevance to the case before us, we are satisfied that our Supreme Court would not apply it retroactively to this October 7, 1976 arrest which was otherwise legally valid when effected. *See State v. Carpentieri*, 82 *N.J.* 546 (1980); *State v. Howery*, 80 *N.J.* 563 (1979).

■ We are satisfied that defendant was entitled to credit for 224 days spent in the county jail awaiting trial. *R.* 3:21–8. The judgment of conviction is therefore modified to reflect that credit. *R.* 2:10–3.

■ Defendant's contention that his life sentence is excessive is totally without merit. Despite defendant's age of 18, we

consider the sentence fully appropriate for this brutal premeditated murder to which he confessed in open court, especially in view of his juvenile and criminal record of assaults, thefts, robberies and armed escape from custody. *State v. Whitaker*, 79 *N.J.* 503 (1979).

As modified, the judgment of conviction and the sentence are affirmed.