# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3443-16T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DAEQUAN A. JOHNSON,

      Defendant-Appellant.

_____

> Argued October 24, 2018 – Decided June 20, 2019
>
> Before Judges Nugent, Reisner, and Mawla.
>
> On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 14-06-1181.
>
> Paul Condon argued the cause for appellant (Law Office of Condon & Theurer, attorneys; Paul Condon, on the brief).
>
> Maura K. Tully, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Ian D. Brater, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant of third-degree criminal coercion, two counts of second-degree sexual assault, and petty disorderly persons harassment. The jurors rejected his defense that he paid the victim for consensual sex during the day, and she misidentified him as the man who sexually assaulted her in an abandoned house later that night. For his crimes, a judge sentenced defendant to an aggregate ten-year prison term. Defendant appeals and presents the following arguments for our consideration:

> POINT I    PRECLUDING DEFENDANT FROM TESTIFYING ABOUT PREVIOUS SEXUAL ENCOUNTERS WITH THE VICTIM DEPRIVED HIM OF A FAIR TRIAL.
>
> POINT II    THE STATE'S FAILURE TO DISCLOSE PRETRIAL COMMUNICATIONS WITH THE VICTIM DEPRIVED DEFENDANT OF A FAIR TRIAL.
>
> POINT III    THE SENTENCE OF THE COURT WAS EXCESSIVE.

Finding no merit in these arguments, we affirm.

I.

A.

A Monmouth County grand jury charged defendant in a seven count indictment with the following offenses: first-degree kidnapping, N.J.S.A. 2C:13-l(b) (Count One); first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3) (Count Two); first-degree aggravated sexual assault with a weapon,

2

N.J.S.A. 2C:14-2(a)(4) (Count Three); first-degree armed robbery, N.J.S.A. 2C:15-1 (Count Four); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (Count Five); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (Count Six); and third-degree terroristic threats, N.J.S.A. 2C:12-3 (Count Seven). Thereafter, the court granted the State's pretrial motion to dismiss the weapons offenses, counts five and six.

Defendant filed a pretrial notice of intent to introduce evidence of the victim's prior sexual conduct. The State objected, arguing New Jersey's Rape Shield Law, N.J.S.A. 2C:14-7, precluded such evidence "to show that she was a prostitute or anything like that." The State conceded that if defendant chose to testify and claim he had a previous sexual encounter with the victim, he could do so to explain why his semen was found by a nurse who examined the victim after she was attacked. During oral argument, the trial court gave a tentative decision agreeing with the State's argument. Defense counsel responded he and his client were inclined to agree with a "majority" of issues the court had tentatively resolved. Defense counsel said nothing more and did not disagree with the court's tentative decision.

The case proceeded to trial, and the jury convicted defendant on count one for the lesser-included offense of criminal coercion; on counts two and three for

the lesser-included offenses of second-degree aggravated sexual assault: and on count seven, for the lesser-included disorderly persons offense, harassment. The jury acquitted defendant of count four, robbery.

Defendant filed motions for a judgment of acquittal and a new trial, which the court denied. The court sentenced defendant to an eighteen-month prison term on count one, criminal coercion; to a ten-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on each of the sexual assault counts, three and four; and to a 1056-day prison term, time defendant had served, on count seven, harassment. The court ordered defendant to comply with the reporting and registration requirements of Megan's Law, N.J.S.A. 2C:7-2, and placed him on parole supervision for life, N.J.S.A. 2C:43-6.4. The court also imposed appropriate penalties and assessments.[1]

B.

The State developed the following evidence at trial. On January 2, 2014, after having dinner at a friend's Keansburg residence, and because her friend was "sickly," the victim shoveled snow from her friend's sidewalk. A man riding a bicycle stopped and offered the victim twenty dollars to shovel snow from the

---

[1] Defendant was also sentenced on a separate indictment, No. 14-06-1145, to a concurrent four-year prison term for terroristic threats.

walk in front of his residence, which was around the corner. She accepted the twenty dollars and followed the man to the house. He walked up to the front door, took out a key, appeared to unlock the door, and entered the house. She began shoveling snow from the adjoining sidewalk and from the front steps.

When she finished, the victim knocked on the front door. The man opened the door, grabbed the victim by her arm and hair, and pulled her into the house. The house was dark and cold. The man demanded "a blow job." When the victim refused, he held a silver and black handgun to her head and forced her up the stairs to the second floor.

On the second floor, the man led the victim to a long, narrow table, and ordered her to remove her clothes and lie on top of the table. She complied and he sexually assaulted her by sucking on her right breast and penetrating her, digitally and with his penis. Throughout the sexual assault, the man held the gun to victim's head. He told her she "better not say anything to anybody or he would find [her] and kill [her]."

The victim estimated the assault lasted for approximately fifteen minutes. When the assailant had finished, the victim found some of her clothes but left behind her bra and tee-shirt. The man took the money the victim had in her coat pocket, including the twenty dollars he had given her earlier, and told her he was

going to get cigarettes. He asked if she intended to remain at the house, and she said, "Oh, yeah, I'll be here." He left through the front door.

The victim waited a short time then ran to her friend's residence. When she arrived, she was crying hysterically. Her friend tried to calm her and asked why she was crying. The victim explained what had happened and then called the police. Officers were dispatched to her friend's home at approximately 10 o'clock and arrived minutes later.

Several Keansburg police officers, including Officer Christopher Rogan and Detective Bryan King, responded to the victim's call. Officer Rogan testified the victim "was hysterical . . . [and] very excited. She had makeup running down her face. You could tell she was very distressed."

The victim informed the responding officers a man had just "raped" her at gunpoint and provided the officers with a description of her assailant. Officer Rogan and four other officers proceeded around the corner to the scene of the attack. The home was vacant and appeared to have been abandoned. The second-story windows were open, there were no lights on inside the building, and the front door appeared to have been "kicked in or broken into," which prevented it from being closed completely. The officers noticed there was no snow on the walkway leading up to the residence. The officers entered the house

but found no one inside. The victim's bra and tee-shirt were inside a room on the second floor, where the officers also saw a short dresser.

Meanwhile, Detective King transported the victim to the hospital, where she was examined by a forensic sexual assault nurse examiner (SANE nurse, or nurse). The victim said she had not engaged in consensual intercourse in the past five days. The SANE nurse reported that the victim said she had been attacked by an "acquaintance." In a statement the victim later gave to a detective, she said she had never seen her assailant before that night. The victim gave conflicting descriptions of the assailant to the nurse and detective.

The SANE nurse conducted an external visual examination and an internal examination. She observed the victim's "right nipple was slightly purple[.]" During the internal examination, the nurse "observed a red and painful area to the labia minora and the periurethral tissue, which are structures outside the vagina." She also observed a white discharge on the victim's cervix and collected a specimen with a swab. This specimen was sent to the New Jersey State Police Laboratory for forensic analysis. The specimen tested positive for semen and sperm. A forensic scientist extracted a DNA profile. The profile was compared to defendant's known DNA profile. They matched.

After the SANE nurse completed her examination, King transported the victim to police headquarters, where, beginning at approximately two o'clock in the morning, she gave a formal, type-written statement. At the conclusion of the victim's statement, an officer drove her back to her friend's residence.

Later that day, the victim returned to police headquarters to view a photographic array in an attempt to identify her assailant. The victim viewed six photographs but did not initially identify anyone. As she continued to view the photos, she noticed the man in one photo was wearing a chain. Her assailant had worn a chain. She told the detective who had shown her the photographs that the man wearing the chain "resembles the one that hurt me."

During cross-examination, defense counsel questioned the victim extensively about inconsistencies in her descriptions of the assailant to police and to the SANE nurse. Defense counsel also questioned the victim about her in-court and out-of-court identifications of defendant as her assailant. During his questioning, defense counsel asked, "Isn't it true, you don't know who took you to [the abandoned house]?" The victim responded she was "sure of it now because of the DNA[.]"

Defense counsel immediately requested a mistrial based on the victim's answer and the prosecutor's failure to disclose the State had informed her of the

8

DNA test results. The prosecutor responded the State's communication with the victim was not improper, and in any event, the State's nondisclosure was not grounds for a mistrial; rather, the proper remedy was to permit defense counsel to further explore the issue with the victim on cross-examination.

The trial court denied defendant's request for a mistrial but gave the jury the following instruction:

> In a case such as this the State bears the proof of facts essential to the charges. In this case identification is an issue. We do not have yet competent and credible evidence of DNA analysis showing any identity.
>
> Even if we did, if there was suggestion to a witness of some perpetrator's identification, that is something that the jury should consider because it could affect credibility. That's for you to determine.

The court then recessed the trial and gave defense counsel the opportunity to interview the assistant prosecutor who had disclosed the DNA test results to the victim.

When the trial resumed, defense counsel continued his cross-examination:

> [Defense counsel:] . . . before we broke you indicated that the prosecutor shared some evidence with you, right?
>
> [Victim:] Correct.
>
> [Defense counsel:] And the prosecutor who shared the evidence with you is . . . in court --

[Victim:] Correct.

. . . .

[Defense counsel:] So -- and he actually shared this information [with] you before you testified at Grand Jury; isn't that correct?

[Victim:] I'm not sure if it was before or after, sir. I really couldn't answer that.

[Defense counsel:] You don't recall, is that --

[Victim:] I don't recall.

[Defense counsel:] And did he share with you that the evidence established that [defendant] was the person who harmed you on that night, is that what he told you?

[Victim:] At that time he just stated that the evidence was in, that was -- that's all basically was said to me in the beginning.

[Defense counsel:] Before you went to Grand Jury?

[Victim:] I believe it was after Grand Jury. They didn't you know, I didn't really inquire about a name at that time to be honest with you.

. . . .

[Defense counsel:] [The State] sent you a letter?

[Victim:] Yes.

[Defense counsel:] Telling you what?

[Victim:] With the name.

. . . .

[Defense counsel:] Okay. What did the letter say from the State?

[Victim:] They had an arrest and they stated his name, and that's about it, the arrest [of] the man.

[Defense counsel:] But you testified a little while ago that the reason you believe my client is the person who harmed you on that night is because of information that the State gave you, correct?

[Victim:] Correct, sir.

[Defense counsel:] So it's not based on your recollection, right?

[Victim:] It's based on mostly my recollection and evidence.

. . . .

[Defense counsel:] In the photo array you primarily picked the person out because of the gold chain, right?

[Victim:] Correct.

[Defense counsel:] Not because you recognized the person as the person who hurt you, right?

[Victim:] I just -- it looked like the . . . guy that did it. The man that hurt me --

[Defense counsel:] Your exact words were, [i]t resembles the person, right?

[Victim:] Yes, sir.

. . . .

[Defense counsel:] Which means that -- if someone resembles, it means they look like?

[Victim:] Correct.

[Defense counsel:] But if -- I mean -- so you don't -- you didn't know?

[Victim:] Correct, sir.

[Defense counsel:] But after the prosecutor shared this information with you about evidence in the case you became sure, right?

[Victim:] Correct. When I got the letter, sir. Thank you.

[Defense counsel:] So your identification -- it's okay. Your identification of my client as the perpetrator is based on information that the State provided you, right?

[Victim:] Correct.

[Defense counsel:] And so it's true that . . . my client may not be the person that went to [the abandoned house] isn't that true?

[Victim:] Correct.

Two days after the attack, at a detective's request, defendant came to police headquarters where Detective King and another detective conducted a video-recorded interview with defendant at police headquarters. During the interview, defendant told detectives that on January 2, 2014, the morning of the

12

day the victim was attacked, he woke up at his mother's home at approximately one o'clock in the afternoon, went to his friend's house for a few hours, then returned to his mother's home at around 4:00 o'clock. He remained there for the rest of the day and night, watching movies and playing games. Defendant denied having sexually assaulted anyone on that date, claimed he "never had sex with [any] woman," and asserted he did not know what the detectives were talking about.

A few weeks later, defendant's friend was arrested on an unrelated warrant and brought to police headquarters. While there, he agreed to speak to Detective King and another detective and provide them with any information he had regarding defendant's whereabouts on January 2. He said he had known defendant for several years and they were "close friends" in 2014. He explained he used to live at the house where the victim was assaulted, but he and his family moved out after Superstorm Sandy devastated the area in 2012. The sexual assault had taken place in the room that had once been his bedroom.

Defendant's friend testified for the State and told the jury he recalled defendant visiting him at his former home on five or six occasions. He also related how in late January 2014, he told detectives about a recent conversation he had with defendant when defendant came to his home. Defendant's friend

explained that defendant said he had "raped" a woman at the friend's "old house." According to the friend, defendant said he "dr[agged] her through the alleyway, brought her upstairs, and . . . rape[d] her." The friend testified he told the police about his conversation with defendant because his mother had been raped.

The defense presented the testimony of two witnesses at trial, Barbara Labriola and defendant. Labriola testified she was "good friends" with both the victim and the friend the victim visited on the day of the assault. Labriola claimed that on January 2, at approximately 11:00 p.m., the victim came to her home, which was two units away from the residence of the victim's friend. According to Labriola, the victim appeared to be "[h]igh" as she was slurring her words and having trouble maintaining her balance. Sometime later, as the victim exited Labriola's residence, she said she was "going out to sell her. . . [p]ussy to make some money." Labriola opened the door for the victim and then watched her walk to her friend's residence. Labriola stood outside her home and continued to watch the victim "to make sure she was okay."

A short time later, Labriola saw the victim speaking with a man on a bicycle. Approximately five minutes later, the victim and this man "walked off around the corner . . . ." Labriola described the man as approximately six-foot-

14

three-inches tall, around 200 pounds, with dreadlock hair and wearing an army fatigue jacket and a black hoodie. When asked if defendant was the person who was with the victim that night, Labriola responded "[n]o." Labriola testified she next saw the victim at approximately 2:00 a.m., after the victim had called and invited Labriola to come over to her residence.

Defendant testified he was staying at his mother's home on January 2, 2014. He left his mother's house that day at around 1:00 p.m. and walked to his friend's home, where he stayed for approximately two hours before leaving and walking back towards his mother's home. Defendant claimed that while walking back to his mother's home, he encountered the victim on the street and had a conversation with her. According to defendant, the victim asked him if he wanted to have sex with her in exchange for twenty dollars. Defendant agreed, and the victim led him over to her friend's residence where they engaged in sexual intercourse on the couch in the living room.

Defendant testified he did not wear a condom at that time. He admitted climaxing inside the victim. When they finished, defendant "paid her the $20, and . . . proceeded to leave," but she "wanted more money." Defendant refused to pay her any more money, which angered her. She began "cursing [defendant] out" as he exited the residence. Defendant testified he walked straight to his

mother's home, where he remained for the rest of the night. He denied sexually assaulting the victim inside the abandoned house.

Defense counsel asked defendant whether he had ever been sexually intimate with the victim before the date of the alleged assault. Defendant responded "[y]es, multiple occasions[,]" the first of which occurred in November 2013. Defense counsel next asked defendant to recount "the circumstances surrounding" his November 2013 sexual encounter with the victim. The prosecutor objected, arguing at sidebar defense counsel was "getting into something that happened over a year before" which had no tendency to explain why defendant's semen was found inside the victim's cervix during the SANE examination. When questioned by the trial court, defense counsel acknowledged he was not offering the testimony to explain the presence of defendant's semen inside the victim on January 2, 2014. As a result, the trial court sustained the prosecutor's objection. Notwithstanding the trial court's ruling, defendant testified, without objection, that he had been alone with the victim on six occasions prior to January 2, 2014.

Defendant also testified that he encountered the victim on the street the next day and she again offered to have sex with him for money. He declined, having no money to pay her.

Defendant denied he ever told his friend he had raped a woman at the abandoned house. As for his statement to the police, defendant claimed he told the detectives he did not have sex with anyone on the night of January 2, 2014, because "they were questioning me about that night" and had not asked whether he had sex with anyone during the day.

## II.

Defendant first argues the trial court denied him a fair trial when it precluded him from testifying about previous encounters with the victim. Because defendant's argument is based on his misconstruction of the trial record, and because defendant did tell the jury he had previous consensual encounters with the victim, we reject the argument.

In his appellate brief, defendant asserts: "During direct examination, defense counsel then asked defendant about prior sexual encounters he had with the victim. . . . The State objected arguing that the basis for the introduction of evidence of sexual activity between defendant and the victim is only admissible as to the source of semen." According to defendant's brief, "[t]he defense was cut off by the State and the [c]ourt quickly ruled that it was excluded because it was not the source of [the] semen." Defendant's appellate brief adds, "[t]he

court sustained the State's objection and prevented defendant from testifying any further about prior sexual activity between himself and the victim."

Defendant overlooks his testimony – given without objection by the State – that he had been intimate with the victim on multiple occasions before the day defendant was assaulted, the first occasion having occurred a year before the alleged assault. The State objected when defense counsel attempted to elicit the circumstances of that first encounter. Even after the court sustained the State's objection, defendant testified without objection that he had been alone with the victim on six occasions before January 2, 2014.

Following defendant's conviction, the judge who heard defendant's post-trial motions rejected his argument that he had been improperly precluded from testifying about his previous sexual encounters with the victim. The judge determined the probative value of such evidence was outweighed by the unwarranted invasion of the victim's privacy. The judge rejected defendant's argument that the evidence was crucial to defendant's defense, as defendant denied he was at the crime scene on the date of the alleged crime and did not claim the defense of consent during trial.

Our review of a trial court's ruling on the admissibility or inadmissibility of evidence is deferential. We will uphold the ruling "absent a showing of an

18

abuse of discretion, i.e., there has been a clear error of judgment." State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Merrero, 148 N.J. 469, 484 (1997)); accord, State v. J.A.C., 210 N.J. 281, 295 (2012). "An appellate court applying this standard 'should not substitute its own judgment for that of the trial court, unless "the trial court's ruling is so wide of the mark that a manifest denial of justice resulted."'" J.A.C., 210 N.J. at 295 (quoting Marrero, 148 N.J. at 484).

New Jersey's Rape Shield Statute, N.J.S.A. 2C:14-7(a), provides in pertinent part:

> When the defendant seeks to admit [evidence of the victim's prior sexual conduct[2]] for any purpose, the defendant must apply for an order of the court before the trial or preliminary hearing . . . . After the application is made, the court shall conduct a hearing in camera to determine the admissibility of the evidence. If the court finds that evidence offered by the defendant regarding the sexual conduct of the victim is relevant and highly material and meets the requirements of subsections c. and d. of this section and that the probative value of the evidence offered substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim, the court shall enter an order setting forth with specificity what

---

[2] N.J.S.A. 2C:14-7(f) defines "sexual conduct" as "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living arrangement and life style."

19

evidence may be introduced and the nature of the questions which shall be permitted, and the reasons why the court finds that such evidence satisfies the standards contained in this section. The defendant may then offer evidence under the order of the court.

N.J.S.A. 2C:14-7(d) states:

Evidence of the victim's previous sexual conduct with the defendant shall be considered relevant if it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively permitted the sexual behavior complained of.

Here, contrary to defendant's argument, he was not precluded from testifying about the victim's previous sexual conduct. The record demonstrates he told the jury he had previously been intimate with the victim on multiple occasions, the first time nearly a year before she was sexually assaulted. Moreover, after the court sustained an objection to defense counsel's attempt to elicit the details of defendant's first sexual encounter with the victim, defendant testified he had been alone with the victim six times before the day she was assaulted. Thus, defendant's claim that he had multiple sexual encounters with the victim before the day of her assault was before the jury to consider.

Defendant has not explained on this appeal, nor can we discern where he explained to the trial court, why the details of the previous encounters were

20

critical to his defense. After all, his defense was that he had consensual sex with defendant on the day she was attacked, she was attacked later during the night, and she misidentified him as the person who attacked her. He did not claim he had consensual sex with her in the abandoned house where she was sexually assaulted. Considering that defendant testified he had sexual encounters with the victim on multiple previous occasions, and in view of the absence of any argument about why the details of the previous encounters were relevant, let alone critical to his defense, we cannot find that the trial court abused its discretion when it sustained the State's objection. J.A.C., 210 N.J. at 295.

## III.

Defendant next argues the State's failure to disclose that an assistant prosecutor had informed the victim of the DNA results deprived him of a fair trial. The State contends that even if disclosure was required, defendant suffered no prejudice based on the nondisclosure.

Indisputably, the State's suppression of evidence favorable to an accused violates due process if the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). "Evidence impeaching the testimony of a government witness falls within the Brady rule when the reliability of the

witness may be determinative of a criminal defendant's guilt[.]" State v. Carter, 91 N.J. 86, 111 (1989) (citing Giglio v. United States, 405 U.S. 150 (1972)).

Here, in hindsight, it is arguable the victim's receipt of information from an assistant prosecutor – that defendant's DNA was in the sperm sample – was Brady material: it caused her to identify defendant with certainty, whereas before being informed about the DNA sample her identification of defendant was at best tentative. But the record is unclear as to when the State learned exactly what defendant's defense would be.[3] And certainly the victim had the right to be informed of significant developments in the case. We need not resolve these possibly competing interests, however, because any possible error was cured by the trial court's instructions to the jury and by the court's permitting defendant to interview the assistant prosecutor who made the disclosure.

When the victim referred to the DNA evidence and defendant moved for a mistrial, the court promptly reminded the jury the State had the burden of proof, that identification was an issue, and if the victim had been informed of some perpetrator's identification, that was something the jury should consider because it could affect credibility. More significantly, after defense counsel

---

[3] Defense counsel did not reveal in his opening statement that his strategy would be consensual sex and misidentification, not merely consensual sex.

A-3443-16T2

spoke to the assistant prosecutor who made the disclosure to the victim, defense counsel skillfully cross-examined the victim. So effective was defense counsel's cross-examination, the victim admitted her identification of defendant was based on information the State had provided to her and it was possible defendant might not have been the person who went to the abandoned house; points defense counsel repeatedly emphasized in his summation.

It is difficult to conceive how the cross-examination could have been more effective had defendant learned of the disclosure at an earlier time. Considering the trial court's prompt instruction to the jury and defense counsel's effective cross-examination, the State's non-disclosure during discovery, if error, was harmless. R. 2:10-2.

IV.

Defendant contends in his final point that his sentence is excessive. He argues that the sentencing judge erroneously found the nature of the circumstances of the offense to be an aggravating factor and failed to consider the mitigating fact that this was his first indictable offense.

"Appellate review of a criminal sentence is limited; a reviewing court decides whether there is a 'clear showing of abuse of discretion.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512

(1979)); see also State v. Gardner, 113 N.J. 510, 516 (1979) ("[A] sentence imposed by a trial court is not to be upset on appeal unless it represents an abuse of the lower court's discretion."). "Appellate courts must affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" Bolvito, 217 N.J. at 228 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

"The general deference to sentencing decisions includes application of the factors set forth in N.J.S.A. 2C:44-1(a) and (b): appellate courts do not substitute [their] assessment of aggravating and mitigating factors for the trial court's judgment." State v. Miller, 237 N.J. 15, 28-29 (2019) (alteration in original) (citations omitted).

N.J.S.A. 2C:44-1(a)(1) states:

> In determining the appropriate sentence to be imposed on a person who has been convicted of an offense, the court shall consider the following aggravating circumstances:
>
> . . . The nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner[.]

Here, the sentencing court determined:

> Certainly the circumstance of this offense, whether it was tried down to . . . a sexual assault, I note the circumstances of the offense, the location of the offense, the circumstances under which it occurred, the utter darkness, the coldness, the other characteristics of the circumstances of this offense are utterly harrowing.

> So I don't disagree that [a]ggravating [f]actor [number one] is reserved for particularly heinous sets of circumstances, but given the circumstances in which this victim found herself, a promise for a snow shoveling job . . . at [the abandoned house], I view those especially heinous, especially cruel, and under all the circumstances certainly committed in a depraved manner, whether the jury tried it down to a sexual assault in lieu of aggravated sexual assault. This certainly represents the exception to the rule in my review of the circumstances under which this crime was committed, so I am confident that is what the [L]egislature contemplated in developing [a]ggravating [f]actor [number one].

> Aggravating [f]actor [three] applies in this [c]ourt's view . . . the risk this defendant will commit another offense. There's certainly that risk.

> If you look at his record . . . as a juvenile and in [m]unicipal [c]ourt, his disregard for the law in the past, there's a risk he will commit another offense. That's been demonstrated by his prior record. The extent and seriousness of his prior record, again, is a qualitative determination that the [c]ourt is required to make note of the circumstances. I'm convinced that that aggravating factor does apply, and for sure the need to deter this defendant and others from violating the law.

25

It's difficult, in fact, it's impossible to find any mitigating factors apply here whatsoever so the [c]ourt is clearly convinced the aggravating factors substantially outweigh the mitigating factors.

The record supported the sentencing judge's finding of this aggravating factor. Considering our deferential standard of review, we certainly cannot find the judge abused his discretion in making this determination.

Nor do we find that the judge abused his discretion by failing to find as a mitigating factor defendant had no prior convictions for indictable offenses. N.J.S.A. 2C:44-1(b)(7) states:

In determining the appropriate sentence to be imposed on a person who has been convicted of an offense, the court may properly consider the following mitigating circumstances:

. . . The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense[.]

Defendant had a history of juvenile and municipal court offenses that supported the judge's decision.

The sentencing judge followed and applied the sentencing guidelines. The record supports the sentencing judge's finding of aggravating factors one, three, six, and nine, and the absence of mitigating factors. We find no abuse of discretion in the judge's sentencing decision.

26

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3443-16T2