**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2625-15T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES KNIGHT, JR., a/k/a
CARTER KNIGHT, J. KNIGHT,
JAMES ARTHUR KNIGHT,
JAMES-JR. KNIGHT, JIMMY
KNIGHT, JR. KNIGHT, JAMES
NIGHT, and JUNIOR KNIGHT,

     Defendant-Appellant.

_____

Submitted November 8, 2018 – Decided September 12, 2019

Before Judges Nugent and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 14-03-0210.

Joseph E. Krakora, Public Defender, attorney for appellant (Alicia J. Hubbard, Assistant Deputy Public Defender, of counsel and on the brief).

Michael A. Monahan, Acting Union County Prosecutor, attorney for respondent (Meredith L. Balo, Special

Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Indicted and convicted for attempted murder, armed robbery, two counts of assault, and two weapons offenses, and sentenced to life imprisonment, defendant, James Knight, Jr., seeks to have his conviction reversed and his sentenced vacated. He makes these arguments:

> POINT I
> THE COURT ALLOWED THE JURY TO HEAR THE ACCUSER'S UNRELIABLE IN-COURT IDENTIFICATION, AND THEN COMPOUNDED THE PROBLEM BY MISCHARACTERIZING THE IDENTIFICATION MADE BY ANOTHER WITNESS AND FAILING TO PROVIDE THE FACT FINDERS WITH APPROPRIATE JURY INSTRUCTIONS ON HOW TO CONSIDER THE EVIDENCE. (U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) (NOT RAISED BELOW).

> POINT II
> AN EXCESSIVE SENTENCE WAS IMPOSED AFTER THE COURT IMPROPERLY USED THE SAME FACTORS BOTH TO FIRST IMPOSE AN EXTENDED TERM THEN SET A TERM OF LIFE IMPRISONMENT WITHOUT ANY ADDITIONAL ANALYSIS. THE COURT ALSO IMPROPERLY FOUND INAPPLICABLE AGGRAVATING FACTORS.

For the reasons that follow, we affirm.

A-2625-15T4

## I.

## A.

A grand jury charged defendant in a six-count indictment with the first-degree crimes of attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3, and armed robbery, N.J.S.A. 2C:15-1; second-degree and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) and N.J.S.A. 2C:12-1(a)(2); and the second-degree crimes of unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). Following the indictment, the trial court granted defendant's motions to suppress the victim's out-of-court identification and bar her from identifying defendant during the trial.

A jury convicted defendant on all counts. The trial court granted the State's application to sentence defendant to an extended term. After merging the aggravated assault counts, the court imposed concurrent sentences on the four remaining counts. For attempted murder, the court sentenced defendant to life imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. For armed robbery, the court sentenced defendant to a term of twenty years subject to NERA. For unlawful possession of a weapon and possession of a weapon for an unlawful purpose, the court sentenced defendant to, respectively,

a ten-year prison term with five years of parole ineligibility and an eight-year prison term with four years of parole ineligibility. The court also imposed appropriate fines, penalties, and assessments.

B.

During defendant's trial, the State presented the testimony of twenty witnesses, showed the jury surveillance videos, played the recorded 9-1-1 calls of witnesses, and played a recording of defendant's statement to police. The State's proofs included the following evidence.

The victim was working alone in her son's Plainfield perfume store at or around noon on October 5, 2013, when a man stood in the store's doorway and asked to use a phone. She said she did not have one. He left but returned approximately one hour later and asked to purchase perfume. She reached for a bottle of perfume beneath the counter and when she turned to give it to him he shot her in the chest with a handgun. The man pulled the trigger again, repeatedly, but the gun would not fire, so he struck the victim's head twice with the gun butt and then began striking her back and her head with a chair. Despite the violent attack, the victim eventually managed to walk out of the store. She was later hospitalized and treated for a three-millimeter gunshot wound to her left chest and back, the latter likely an exit wound, and four cuts on her head.

A-2625-15T4

The assailant could be seen on a store surveillance video, though his face was covered. The victim described him as a tall, thin black man wearing a white shirt and black jacket with a hood. During her trial testimony, when asked if her assailant was skinny, fat, or somewhere in between, the victim replied that he was skinny then, fat now. Defendant did not object to the comment.

Several witnesses saw the victim exit the store, screaming and covered in blood. She was pointed out her assailant as he ran away. One witness began to give chase but stopped after a short distance out of concern the man might be armed.

Another witness, who had heard a gunshot, saw a black man run out of the store. The man was wearing a white shirt, another shirt on top, which was either black or blue, and "blue jeans and sandals." The second witness saw the victim come out of the store, "desperate" and "covered in blood." The second witness followed the assailant as he ran into a lot behind a wall. The witness knew there was no exit for the assailant, so the witness remained in place until the assailant emerged from the lot and then chased the assailant as he ran into an appliance store. The police arrived and the second witness directed them into the appliance store. When he testified at trial, the second witness identified the assailant in the video as the man he chased into the appliance store.

5

An appliance store employee testified that a six-foot-one or six-foot-two, "slender, black" male, whom the employee identified as defendant, entered the store "somewhere around lunchtime" and said "they're going to get me." The employee testified defendant looked "very distraught" and "tense" and he was also "sweating." Defendant headed to the back of the store, which had no rear exit but did have a stairway to a second story that was used for storage. "Waves" of four to five people followed defendant. Ultimately, twenty to thirty people entered the store in pursuit of defendant, "yelling[] call 9-1-1, call 9-1-1."

Sergeants Nuno Carvalho and Christopher Sylvester were among the several Plainfield Police Officers who responded to the appliance store. Sergeant Carvalho testified he and the other officers entered the building, yelled "Plainfield Police," and told the crowd and employees to leave the building. The officers searched the first floor but did not locate the suspect. They ascended the stairs to the second floor while continuing to yell, "Plainfield Police" and "Plainfield Police. Is anyone up here? Plainfield Police." The officers received no response. The second floor was pitch dark so Sergeant Carvalho scanned the room with his flashlight. The room was full of "[o]ld boxes, a lot of papers and debris[.]" As Sergeant Carvalho scanned the room he saw defendant's "head

A-2625-15T4

protruding from the top of some boxes[.]" Sergeant Carvalho drew his weapon and yelled "Plainfield Police, show me your hands."

Defendant did not immediately respond. Only after Sergeant Sylvester reached the second story and joined Sergeant Carvalho in yelling for defendant to show the officers his hands did defendant cease crouching behind the boxes. Although defendant rose up onto his knees, defendant remained noncompliant with the officers' requests for him to show them his hands, so Sergeant Carvalho provided cover while Sergeant Sylvester handcuffed defendant. As the officers placed defendant in handcuffs, Sergeant Carvalho noticed defendant had blood on his shirt but did not appear to be bleeding. Sergeant Sylvester recovered a bloodied Yankees baseball cap from the area where defendant was hiding.

Defendant was transported to Plainfield Police headquarters for booking. Defendant's Nike sandals, jeans, belt, black dress shirt, and white t-shirt were all taken as evidence. The Yankees baseball cap was also taken as evidence.

Plainfield Police Officer Anastasio Anastasatos was among the crime scene investigators who responded to the perfume store to process the blood-splattered scene. The officer discovered a .22 caliber handgun that had malfunctioned when a cartridge stuck in the ejection port.

The scientific testimony elicited at trial established the bloodstains on defendant's jeans and white t-shirt matched the victim's DNA. The results of the testing performed on the grip of the .22 handgun recovered from the Store revealed two DNA profiles. The victim "could not be excluded as a major contributor" of that profile and defendant "could not be excluded as a possible minor contributor[.]"

Defendant testified on his own behalf. He denied assaulting the victim. Defendant stated he was involved in a physical altercation with a man who almost knocked defendant down when the man came running out of a parking lot. Defendant said the man was wielding an iron pipe and had blood on his hands and arms. When asked to describe the man, defendant testified the man was a slim black man wearing a dark–colored short sleeve shirt, who appeared to be in his thirties. After exchanging words, the men tried to strike defendant with the pipe, but defendant ducked and hit the man. Defendant kicked and tripped the man, then stood over him to hit him again. Just then, two Spanish men came running around the corner yelling. One had a gun. Defendant fled to the appliance store. Sometime during the altercation, he realized he had dropped his knit cap. He inadvertently picked up another, which must have been his assailant's cap. Police retrieved the cap from the floor when they arrested him.

Defendant was impeached with the transcript of his recorded statement to the police and admitted he told the police the man wielding the pipe was "Spanish." According to the transcript of defendant's recorded statement, defendant reported the man was wearing a "white" shirt. However, defendant asserted that was a "misprint." Defendant was also was confronted with portions of the surveillance video of the victim's attacker entering the perfume store. Defendant was asked whether or not the person in the video had a similar appearance to the man with the pipe. Defendant replied, "No, this person has on a long-sleeve shirt." When defendant was asked if he could identify the attacker's shoes, he could not deny the attacker was wearing black Nike flip flops with socks like defendant was wearing when arrested. Defendant also admitted the person depicted in the video was wearing a white t-shirt with a dark-colored, long-sleeve shirt on top, jeans, and a Yankees baseball cap.

C.

During defendant's sentencing proceeding, the court granted the State's motion to sentence defendant to an extended term of ten years to life. N.J.S.A. 2C:44-3(a); N.J.S.A. 2C:43-7(a)(2); State v. Pierce, 188 N.J. 155, 168 (2006). Defendant did not dispute that he was eligible for an extended term under the statutory criteria.

9

In determining the appropriate sentence, the court found five aggravating factors and no mitigating factors. The court found the aggravating factors delineated in N.J.S.A. 2C:44-1(a)(1), the nature and circumstances of the offense, including whether it was committed in an especially heinous, cruel or depraved manner, based on the severe beating defendant inflicted on his victim—with the gun and the chair—after robbing and shooting her. The court found aggravating factors delineated in N.J.S.A. 2C:44-1(a)(2), the gravity and seriousness of harm inflicted on the victim, including whether she was particularly vulnerable or incapable of resistance, based on the woman being beaten while she was alone in the store and entirely unsuspecting until she turned around when and defendant shot her.

The court also found the aggravating factors delineated in N.J.S.A. 2C:44-1(a)(3), the risk defendant would reoffend; 2C:44-1(a)(6), the extent of his prior criminal record and the seriousness of his prior crimes; and 2C:44-1(a)(9), the need for deterring defendant. Last, the court found the public needed protection. The court based these findings on defendant's eleven prior convictions, drug abuse, lack of success in diversionary programs, prior crimes of a similar nature, and lack of stable employment. The court sentenced defendant to an aggregate term of life imprisonment subject to NERA.

II.

Defendant argues the trial court allowed the jury to hear an impermissible in-court identification of defendant by the victim. Defendant also argues the trial court failed to provide appropriate jury instructions. Defendant did not object to the alleged errors at trial.

A.

In evaluating defendant's arguments, we bear in mind that the "[a]bsence of contemporaneous objection may lead to a fair inference that 'in the context of the trial the error was actually of no moment.'" State v. McGuire, 419 N.J. Super. 88, 149-50 (App. Div. 2011) (quoting State v. Nelson, 173 N.J. 417, 471 (2002)); accord State v. Echols, 199 N.J. 344, 360 (2009) ("Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made.") (quoting State v. Timmendequas, 161 N.J. 515, 576 (1999)).

When defendants do not object at trial to evidence or testimony they later challenge on appeal, the defendants "must demonstrate plain error to prevail. Plain error is 'error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the

jury fairly evaluate the merits of his defense.'" Timmendequas, 161 N.J. at 576-77 (quoting State v. Irving, 114 N.J. 427, 444 (1989)).

Similarly, "[o]ur rules provide that a defendant waives the right to contest an instruction on appeal if he does not object to the instruction." State v. Torres, 183 N.J. 554, 564 (2005) (citing R. 1:7-2.). "We will reverse on the basis of unchallenged error if we find error was 'clearly capable of producing an unjust result.'" State v. Burns, 192 N.J. 312, 341 (2007) (quoting R. 2:10-2).

> "Plain error in the context of a jury charge is '[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'"
>
> [Torres, 183 N.J. at 564 (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).]

Even if we determine the charge contained an error, the "error must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

### B.

Here, before trial, the court suppressed the victim's out-of-court identification of defendant because it had come about as the result of an unduly

suggestive identification procedure. The court precluded the State from conducting an in-court identification of defendant by the victim. During her trial testimony, when the victim was asked if her assailant appeared to be skinny, fat, or somewhere in between, she replied: "Back then, he was thin. Right now, he's fat." Defense counsel did not object or move to strike. The prosecutor immediately moved on to having the victim explain where her assailant shot her.

Defendant now argues the victim's comment informed the jury she believed defendant was her attacker. He adds that because the trial court barred the victim from identifying defendant in court as her attacker, her testimony denied defendant a fair trial. We disagree.

The victim's comment was fleeting. There is no evidence she looked at defendant or pointed to defendant when she made it. It came almost immediately after she had become emotional, expressing disbelief and her inability to understand why the assailant wanted to kill her when she had done nothing to him. In this instance, the absence of a contemporaneous objection does lead to a fair inference that in the context of the trial the error was actually of no moment. McGuire, 419 N.J. Super. at 149-50.

What's more, in view of the State's overwhelming evidence of defendant's guilt, we conclude defendant has failed to demonstrate the victim's fleeting

reference to her assailant being fat "now" possessed any capacity, let alone a clear capacity, to bring about an unjust result. R. 2:10-2. State v. Pressley, 232 N.J. 587, 594 (2018). The jury's finding that the defense was incredible is easily understandable, considering defendant was seen exiting the perfume store, chased to the appliance store, and apprehended in the same clothes and hat worn by the perpetrator. Defendant's explanation as to how the victim's blood got on his clothes defied reason and common sense.

C.

For similar reasons, we reject defendant's challenge to the jury instruction on identification, which defendant now challenges for the first time. Defendant argues the trial court gave an inaccurate and inadequate jury instruction regarding the second witness's identification of defendant. Recall the second witness saw defendant exit the store and chased him to the appliance store, after waiting as defendant turned into a lot—a lot the witness knew defendant could not exit—and returned.

Defendant emphasizes the underscored text in the following portion of the trial court's instruction to the jury in support of his contention:

> You heard testimony that [the second witness] expressed his level of certainty that the person he selected is . . . in fact, the person who committed the crime. As I explained earlier, a witness's level of

14

confidence, standing alone, may not be an indication of reliability of the identification. Although some research has found that highly confident witnesses are more likely to make accurate identifications, eyewitness confidence is generally an unreliable indicator of accuracy.

We reject the argument, as well as the tactic of taking part of a jury charge out of context and misconstruing a court's comments. Given the witness's testimony, the court properly gave the instruction from the Confidence and Accuracy section of the Model Jury Charges (Criminal), "Identification: In-Court Identification Only" (rev. July 19, 2012), and it is entirely understandable why trial counsel did not object to the charge, which was both balanced and appropriate.

Defendant also asserts "[i]t was crucial for the jury to understand that [the second witness's] identification of the person he knew was under arrest as the same person he was chasing earlier could be tainted by the circumstances under which he viewed the man being removed from the building." Defendant suggests the court should have instructed the jury sua sponte on show-ups. There is no support in the record for defendant's argument. The police did not conduct a show-up, and the evidence does not support the argument that the witness's in-court identification was tainted because the witness observed defendant shortly after defendant was arrested. A trial court is required to

15

instruct a jury on remote possibilities unsupported by the evidence presented during the trial.

Defendant's remaining arguments concerning identification are without sufficient merit to warrant further discussion.  R. 2:11-3(e)(2).   The court did not commit error when charging the jury and certainly did not commit plain error.

III.

Defendant argues his sentence is excessive.   He asserts the court improperly applied aggravating factors two and nine; aggravating factor two because the victim was as capable as any other person to resist the attack, and nine—the need for deterrence—because the court improperly considered defendant's continuing proclamation of innocence.   In addition, defendant contends the court failed to conduct a two-part analysis when it granted the State's motion for an extended term and then sentenced defendant to life imprisonment.

"Appellate courts review sentencing determinations in accordance with a deferential standard."  State v. Fuentes, 217 N.J. 57, 70 (2014).  The sentence must be affirmed unless

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the

sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

The Supreme Court has reiterated:

The general deference to sentencing decisions includes application of the factors set forth in N.J.S.A. 2C:44-1(a) and (b): appellate courts do not "'substitute [their] assessment of aggravating and mitigating factors' for the trial court's judgment." State v. Miller, 205 N.J. 109, 127 (2011) (quoting State v. Bieniek, 200 N.J. 601, 608 (2010)). "Permitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to 'undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.'" State v. S.S., 229 N.J. 360, 380-81 (2017) (alteration in original) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment). "[T]he public's interest in 'stability and judicial economy' is promoted by designating our trial courts, rather than appellate courts, as 'the finder of the facts,' in the absence of clear error." Id. at 381 (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment).

[State v. Miller, 237 N.J. 15, 28-29 (2019) (alterations in original).]

Thus, we will not "second-guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record." State v. O'Donnell, 117 N.J. 210, 216 (1989) (citing Roth, 95 N.J. at 365-66 (1984)). When the judge has followed the sentencing guidelines, and his findings of aggravating and mitigating factors are supported by the record, we will only reverse if the sentence "shock[s] the judicial conscience" in light of the particular facts of the case. Roth, 95 N.J. at 364 (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)).

The sentencing record establishes that the court did not violate the sentencing guidelines, and the court's finding of aggravating factors and no mitigating factors was based on competent and credible evidence in the record. Considering defendant's lengthy criminal record, the nature of the crimes that are the subject of his previous convictions, the brutality of the current crime, and the other factors considered by the trial court, we cannot conclude the court's application of the sentencing guidelines to the facts of this case makes the sentence so clearly unreasonable as to shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2625-15T4