**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0976-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LUIS DELCARMEN,
a/k/a LUIS DEL CARMEN,

     Defendant-Appellant.

_____

Submitted February 3, 2022 – Decided February 23, 2022

Before Judges Mawla and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 16-02-0150.

Joseph E. Krakora, Public Defender, attorney for appellant (Alyssa Aiello, Assistant Deputy Public Defender, of counsel and on the briefs).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Luis Delcarmen was convicted by a jury of two counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (a)(2) (counts one and seven); two counts of felony murder, N.J.S.A. 2C:11-3(a)(3) (counts two and eight); one count of first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a)(1) (count ten); one count of first-degree robbery, N.J.S.A. 2C:15-1(a)(1) (count three); three counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (counts five, nine, and eleven); and one count of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count six). After his motion for a new trial was denied, defendant was sentenced to an aggregate 118 years of imprisonment subject to an eighty-five percent parole disqualification, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant challenges his convictions and sentence, which we now affirm.

This case arises from a June 20, 2015 shooting in front of a Passaic lounge, which left two dead and one seriously injured. That night, Amin Rivas was celebrating his twenty-fourth birthday at the lounge with friends, including EnPaul Cantero, Denise Gonzalez, Ivan Santiago, Eric Gonzalez, and Angelica Arias. Cantero wore a gold-colored chain. During the night, Rivas and Cantero were approached by people at the bar who asked whether their jewelry was real.

Rivas and his friends left the club after 2:00 a.m., as it was closing, and lingered in the front.

Defendant, and co-defendants, Johan Gonzalez, and Augusto Solano, were also at the club. Defendant wore capri pants, a t-shirt featuring the American flag and an American Indian woman, and black and white sneakers. Defendant left the lounge before it closed.

Surveillance footage from the club showed a shooting occurred at 2:47 a.m.; the shooter wore a hooded sweatshirt with artwork on the front, capris with white trimming, black and white sneakers, and something covering the top half of his head. The shooter walked up to Cantero, shot him in the abdomen, and struggled with Cantero while taking his chain. The video also showed the shooter fire at Rivas, and the bullet exit through his back and hit Denise.[1] Cantero and Denise were declared dead at the hospital; Rivas survived. Rivas was unable to identify the shooter but noted he was wearing a red hoodie. Santiago identified the shooter as wearing red and a do-rag.

Based on the footage and from community interactions, detective Rinaldo Arroyo identified defendant as the shooter. A few hours after the shooting,

---

[1] We use first names for Denise, Johan, and Eric because they have the same surname. We intend no disrespect.

A-0976-18

defendant and Johan were involved in another shooting in Clifton. Police suspected that Johan and defendant were together and went to Johan's home to look for them.

Police found defendant in the bathroom at Johan's house. Johan's mother consented to a search of her home and police found the black and white sneakers and the t-shirt the shooter wore in the surveillance footage. Police also recovered defendant's phone and passport.

Detective John Rodriguez interviewed Sandy Carrasco who worked security for the lounge the night of the incident. Carrasco stated he recognized defendant, whose nickname was Kimba, from the surveillance footage and identified him from his pants and shirt as the shooter. Carrasco said he saw defendant outside the club wearing a hoodie and something covering his forehead. Carrasco further identified defendant from his shoes and distinctive walk.

While in police custody defendant said the following to Solano: "[Y]ou don't say anything, you hear." Officer Alex Ortiz heard the statement and Rodriguez directed him to write a contemporaneous report of what they overheard.

A-0976-18

Admir Hoornaert was an inmate during defendant's jail stay. Hoornaert assisted other inmates with their legal matters and met with defendant a handful of times to review his case. During a conversation with Hoornaert, defendant admitted to the murders and expressed an interest in "getting rid of" a witness. Hoornaert wrote a letter to the Prosecutor's office to this effect. Nash Williams, also an inmate, overheard defendant's statement, but did not report it.

During the twelve-day trial, the State presented testimony from over twenty fact and expert witnesses. Rivas testified that on the night of the shooting, a man came up to him at the bar and asked if his watch was real. When Cantero joined Rivas at the bar, the man also asked Cantero where he was from and whether his necklace was real and how much it cost. Rivas described the shooting consistent with the video footage and recounted his description of the shooter's clothing as he told police during his interview.

Arias testified and described the scene outside the lounge at closing time and the shooting. She said she talked to police following the incident and identified the shooter as a male with a dark complexion wearing a red hoodie motioning like he had a gun.

Santiago testified that throughout the evening, there was a group of people who kept looking at him and his friends and whispering. He stated that after

5

leaving the club he was talking to Cantero for about fifteen minutes when "a guy came up with a gun and let it off." Santiago said the shooter hovered over Cantero, shooting a couple more times and wore red with a do-rag on his head.

Officer Roberto Cancel testified he responded to the shooting, rendered first aid to one of the victims, canvased the area, and discovered four shell casings. Officer Alex Flores testified he was one of the officers who went to Johan's house and found defendant in the bathroom. A Passaic County crime scene investigation expert testified the gunshot residue test on defendant's hands was negative.

Detective Rodriguez's testimony recounted Carrasco's identification of defendant and defendant's comment during booking. Rodriguez also testified he conducted a photo array for Santiago, which included defendant's picture, but Santiago was unable identify anyone as the shooter.

Detective Arroyo testified he identified Carrasco and defendant from the surveillance footage[2] as individuals he knew from the community. Defense counsel objected to the testimony of how Arroyo knew defendant, arguing the jury would infer Arroyo knew defendant from prior criminal conduct. The trial

---

[2] Arroyo explained he first tried to view the footage on the lounge owner's phone but could not see anything. However, when the footage was transferred to DVD and projected onto a bigger screen, he was able to recognize the shooter.

A-0976-18

judge overruled the objection, noting the jury did not need to know how Arroyo specifically distinguishes defendant, only that he knows him from the community. The judge also instructed the jury as follows:

> You've heard testimony that law enforcement knows or is familiar with the defendant . . . from the community. With reference to this testimony, be reminded that as with all evidence presented in the trial, you may or may not find it credible. You are not to consider the fact that a member . . . of law enforcement testified that they know [defendant] as prejudicing him in any way.
>
> Members of local law enforcement routinely come in contact with many members of the community in a variety of situations, including, but not limited to participating in school events, sports events, and other community events, as well as meeting members of the community by spending time in the community, or from a variety of other situations totally unconnected with criminal activity. Recognition of the defendant from the community . . . by a law enforcement officer who works in that community is not evidence that the defendant has ever been arrested or convicted of a crime.

Arroyo testified he knew defendant's nickname and knew him for approximately ten years. He identified defendant and the clothing he was wearing in the video. He noted defendant had a "little beard" on the chin. Testifying from still photographs of the video footage, Arroyo stated:

> I see [defendant] wearing the same hoodie with the [do-rag] on. As you can see, he has a [do-rag] on with the same capri pants and with the white and black

7 <span>A-0976-18</span>

> Jordan sneakers with his hands in his pockets inside of his hoodie.
>
> . . . .
>
> [H]e had the [do-rag] on.  You can still see the beard that he has there.  And he changed and put a sweater on with some type of graphics in the front.

The State played the surveillance footage for Arroyo, and he identified defendant, wearing the same clothing he previously identified, outside the club at 2:26:42 a.m.  Arroyo narrated the video showing Johan and Solano walking down the street next to defendant.  He noted defendant had nothing on his head at 2:31 a.m.  Arroyo indicated the video showed defendant with "both his hands inside the hoodie with some artwork in the front, with the capri[] pants, the white trimming and the white and black sneakers, approaching my victims, Denise . . . and . . . Cantero."  Arroyo explained defendant then shot Cantero in the stomach, struggled with him, and grabbed his chain after Cantero fell.  Arroyo also identified defendant from the video by "[t]he way he walks, he has a certain walk to him. . . . [W]hen he's walking, his feet go like side to side . . . ."  Arroyo explained he found the shoes and shirt defendant wore during the shooting at Johan's mother's house.

Carrasco testified he knew defendant from playing sports in Passaic.  He contradicted his statements to police from the night of the event in which he

A-0976-18

identified defendant as wearing capris. He claimed he did not recognize defendant in the image from the surveillance footage. The trial judge granted the State's motion to treat Carrasco as a hostile witness and conducted a Gross[3] hearing. The trial judge heard testimony from Carrasco and concluded the Gross factors were met, and the video of Carrasco's statement to the police could be presented to the jury depending on Carrasco's answers. Following the hearing, trial resumed, and Carrasco testified consistently with what he told police during his interview and identified defendant as the shooter from the surveillance video by his clothing and the way he walked.

Hoornaert testified as a jailhouse informant and explained he sent a letter to the Passaic County Prosecutor's office before the trial, notifying the prosecutor defendant "had indicated . . . that he had committed two murders. He had killed two kids and an additional person was shot in the process." He said he told defendant his case was weak because there were witnesses, and defendant responded "well, what if the witness is out." Hoornaert stated defendant proposed $10,000 in exchange for "tak[ing] care of a witness." He also said defendant admitted to taking the chain off one of the victims.

---

[3] State v. Gross, 121 N.J. 1 (1990).

Hoornaert testified this frightened him and caused him to wait nearly two weeks before deciding to write to the prosecutor. He testified he did not ask for anything from the prosecutor's office in return for the testimony aside from immunity.

Williams also testified and confirmed he received no promises or favorable treatment in return for his testimony. He testified he was in the jail library and overheard the conversation between Hoornaert and defendant. Williams did not notify the authorities because Hoornaert indicated he was possibly going to write the letter and Williams feared the consequences.

During the charge conference, the State requested the court include the eyewitness factors in the identification charge under State v. Henderson.[4] The judge declined, finding there was no eyewitness identification. The defense agreed Henderson did not apply.

The judge instructed the jury as follows:

> The State has presented [the] testimony of . . . Arroyo, . . . Carrasco, and . . . Rodriguez. You will recall that these witnesses identified the defendant as the person who committed the offense or offenses. It's your function to determine whether the witness's identifications of the defendant are reliable and believable or whether they're based on a mistake or, for any reason, not worthy of belief. You must decide

---

[4] 208 N.J. 208 (2011).

whether all, some, or none of the identifications are sufficiently reliable evidence that this defendant is the person who committed the offense or offenses charged.

You may consider whether the witness was exposed to opinions, descriptions, or identifications given by other witnesses, to photographs or videos or to any other information or influence that may have affected the independence of the identification. Such information can affect the independent nature and reliability of a witness's identification and inflate the witness's confidence in the identification.

You're also free to consider any other factor based on the evidence or lack of evidence in the case that you consider relevant to your determination whether the identifications were reliable. Keep in mind that the presence of any single factor or combination of factors, however, is not an identification that a particular witness is incorrect. Instead, you may consider all of the . . . circumstances of the case, including all of the testimony and documentary evidence, in determining whether a particular identification made by a witness is accurate and thus worthy of your consideration as you decide whether the State has met its burden to prove identification beyond a reasonable doubt. The ultimate issue of the trustworthiness of an identification is for you to decide.

After the judge instructed the jury, defense counsel stated he was "satisfied" with the instruction.

After the trial, Williams sent several letters to the judge and the prosecutor. He stated although he was not promised anything in exchange for his testimony, he thought the State would help him. In some letters, he asked

11

for assistance in a change of custody motion. He stated: "[He] was uncomfortable with the situation and . . . was interested in some sort of safety" for himself.

The trial judge conducted a hearing. Williams testified the State made no promises to him in exchange for his testimony and was not promised witness protection or offer sentencing help. He testified he wrote the letter when he was "very, very frustrated" and "used some wrong words and gave the wrong impression, but nobody ever promised [him] anything . . . . [He] just expected somebody . . . to get back to [him] . . . ." He merely asked the prosecutor for "a good word" in his change of custody motion.

The State produced additional letters from Williams requesting the State's help regarding a lighter sentence on an out-of-state charge. He claimed his letters were a request for assistance, but that he was not expecting any help and reiterated no promises were ever expressed to him. Detective Angel Perales, whom Williams said would investigate providing protection, testified Williams did not ask for anything in exchange for speaking with the detectives.

Defendant moved for a new trial on grounds Williams' letters were newly discovered evidence which the judge denied. She addressed the Carter[5] factors

---

[5] State v. Carter, 85 N.J. 300 (1981).

and ruled that while the evidence was newly discovered because some of the letters were transmitted after the trial and the pre-trial letters were sent only to the State, they would not have changed Williams' testimony. The judge ruled "although . . . Williams' letters may have expressed a hope and desire for protection or assistance, he was not expressing an expectation of same either before or after testifying." The judge found Williams' testimony was cumulative to Hoornaert's. She noted even without the testimony, there was "overwhelming evidence of the defendant's guilt, making it improbable that the jury would have otherwise reached a different verdict."

The trial judge sentenced defendant. She found aggravating factor one, N.J.S.A. 2C:44-1(a)(1), the nature and circumstances of the offense. She noted the grievous injuries sustained by Rivas and the death of two young people. The judge found aggravating factor two, N.J.S.A. 2C:44-1(a)(2), gravity of the harm, because of the severe injury to Rivas. She found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), risk of re-offense, because the evidence established a plot to kill a witness. The judge also found aggravating factor six, N.J.S.A. 2C:44-1(a)(6), defendant's prior criminal record and seriousness of offenses, noting defendant had a prior record, albeit not a significant one. The judge also found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), the need for deterring

13

defendant and others from committing a future offense noting "a clear concern for public safety." The trial judge found no mitigating factors.

The judge analyzed the Yarbough[6] factors and concluded consecutive sentences were appropriate because most of the factors favored the State. She noted the crimes were not predominantly independent of one another given the timing of the robbery and murders. She found the crimes involved separate acts of violence. She stated:

> [T]he second shooting may appear to be one act, because one bullet struck both victims. But this [c]ourt, however, analyzes the second act as one bullet striking two people and compares it in essence to a death by auto case with more than one victim. Yes, it's one event, but there are multiple victims. So here one firing resulted in two victims. One death and the second grievous injuries. It was an intentional firing. In a death by auto case the Supreme Court of New Jersey has held that consecutive sentences are permissible.[7]

She found the crimes were not committed at different times or places but involved multiple victims.

Defendant was sentenced to fifty years, subject to NERA, for the murder of Cantero, and a consecutive fifty-year term subject to NERA for Denise's

---

[6] State v. Yarbough, 100 N.J. 627 (1985).

[7] State v. Carey, 168 N.J. 413 (2001).

murder. Defendant received an eighteen-year term subject to NERA for the attempted murder of Rivas, consecutive to the murder sentences. The judge sentenced defendant to a concurrent sixteen-year term, subject to NERA, for the robbery. Defendant received ten years pursuant to the Graves Act[8] for unlawful possession of a weapon. The judge merged counts two, four, seven, eight, and ten with the substantive offenses. She noted the five-year parole supervision on counts one, nine, and six would run consecutively.

On appeal, defendant argues:

> I. THE TRIAL COURT ERRED IN PERMITTING . . . ARROYO TO TESTIFY ABOUT WHAT HE SAW ON THE SURVEILLANCE FOOTAGE AND REPEATEDLY IDENTIFY [DEFENDANT] AS THE SHOOTER.
>
> > A. The Identification Was Not Sufficiently Reliable.
> >
> > B. Arroyo's Testimony As To The Contents Of The Surveillance Footage And The Identity Of The Shooter Was Improper Lay-Witness Opinion.
> >
> > C. Even If Familiarity Renders A Video/Photo Identification Admissible In Some Situations, The Probative Value Of Arroyo's Identification Was Outweighed By The Resulting Prejudice.

---

[8] N.J.S.A. 2C:43-6(c).

II. THE JURY DID NOT HAVE THE NECESSARY TOOLS TO PROPERLY EVALUATE CARRASCO'S OUT-OF-COURT IDENTIFICATION, BECAUSE THE IDENTIFICATION CHARGE FAILED TO INCLUDE ANY INSTRUCTION ON THE NATURE OF MEMORY AND THE FACTORS THAT AFFECT THE RELIABILITY OF EYEWITNESS IDENTIFICATION.

III. THE MATTER MUST BE REMANDED BECAUSE THE TRIAL COURT ABUSED ITS DISCRETION IN RUNNING THE SENTENCES ON COUNTS SEVEN AND TEN CONSECUTIVELY, AND FOR RECONSIDERATION OF SENTENCE IN LIGHT OF DEFENDANT'S YOUTH.

Defendant raises the following points in his pro se brief:

I. [DEFENDANT'S] CONVICTION MUST BE VACATED BECAUSE THE STATE PRESENTED INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION.

II. CUMULATIVE TRIAL ERRORS IN THE CONTEXT OF THE PROCEEDINGS BELOW DEPRIVED [DEFENDANT] OF A FAIR TRIAL AND WARRANT REVERSAL.

III. THE TRIAL COURT ERRED WHEN IT DENIED [DEFENDANT'S] MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE WHEN THE PROSECUTION FAILED TO DISCLOSE TO THE DEFENSE LETTERS WRITTEN BY THE INFORMANTS AFTER TRIAL REGARDING BENEFITS DISCUSSED BETWEEN INFORMANTS AND THE PROSECUTOR. MOREOVER, RECENT DIRECTIVE FROM THE ATTORNEY GENERAL REGARDING TESTIMONY

 A-0976-18

OF JAILHOUSE INFORMANTS REQUIRES REVIEW FOR COMPLIANCE REQUIREMENTS TO ENSURE THE RELIABILITY OF JAILHOUSE INFORMANTS' TESTIMONY WARRANTS REVERSAL.

I.

Defendant claims the trial judge erred by allowing Arroyo to testify about the surveillance footage and repeatedly identify defendant as the shooter where the video had poor quality. He asserts Arroyo's testimony exceeded his role as a fact witness because he was permitted to express an opinion about the video's content, including that defendant left the club and returned wearing a different top, despite the State not seeking a clarification. He argues it was prejudicial error to allow Arroyo to tell the jury he knew defendant from the community, and the judge compounded the error by forbidding defense counsel to cross-examine Arroyo about the basis of his knowledge.

A.

N.J.R.E. 701 states: "If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness's perception; and (b) will assist in understanding the witness' testimony or in determining a fact in issue." An officer testifying as a lay witness can provide fact testimony. State v. McLean, 205 N.J. 438, 460

(2011).  A lay "witness must have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies."  State v. LaBrutto, 114 N.J. 187, 197 (1989).

Once a video is established as relevant, it is generally admissible under N.J.R.E. 801(e).  State v. Wilson, 135 N.J. 4, 16 (1994).  "The witness need not have witnessed the crime or been present when the photograph or video recording was made in order to offer admissible testimony."  State v. Sanchez, 247 N.J. 450, 469 (2021).

Where a party does not object, we review the trial court's admission of testimony or evidence under the plain error standard.  See State v. Bueso, 225 N.J. 193, 202-03 (2016).  Plain error is defined as "legal impropriety . . . prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."  State v. Hock, 54 N.J. 526, 538 (1969).  "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated "in light of the overall strength of the State's case."'"  State v. Singh, 245 N.J. 1, 13-14 (2021) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

Recently, the Court held a defendant's parole officer could provide testimony identifying the defendant from a photograph still of a surveillance video. Sanchez, 247 N.J. at 458-59. The Court found the following factors relevant to whether to admit the testimony: 1) the nature, duration, and timing of the witness's contacts with the defendant; 2) if there has been a change in the defendant's appearance since the offense at issue; 3) whether there are additional witnesses available to identify the defendant at trial; and 4) the quality of the photograph or video. Id. at 472-73.

Pursuant to these principles, we perceive no reversible error in allowing Arroyo to testify regarding what he observed in the surveillance video. We note defendant never objected to the admission of the video evidence. Even so, Arroyo's testimony established he knew defendant from prior interactions in the community and he tied this knowledge to his observations of the video by identifying defendant's tattoo and unique walk. Arroyo also testified regarding defendant's facial hair, which corroborated defendant's passport picture. As the lead detective, Arroyo's explained how he identified defendant and provided a rational basis for his testimony. The Sanchez factors were met. Moreover, the testimony was relevant and not prejudicial because it was corroborated by other evidence and the overall strength of the State's case.

A-0976-18

B.

N.J.R.E. 403 excludes relevant evidence when "its probative value is substantially outweighed by the risk of . . . undue prejudice . . . ." Trial courts have considerable discretion when deciding to exclude potentially prejudicial evidence. State v. McDougald, 120 N.J. 523, 577-78 (1990). An abuse of discretion occurs when the admission of prejudicial evidence prevents jurors "from a reasonable and fair evaluation of the basic issue of guilt or innocence." State v. Moore, 122 N.J. 420, 467 (1991) (quoting State v. Sanchez, 224 N.J. Super. 231, 249-50 (App. Div. 1988)).

The trial judge did not err when she ruled defendant could not elicit further testimony of how Arroyo knew defendant. Arroyo's limited testimony explaining he knew defendant from the community was enough to provide a rational basis to explain how he identified defendant using the other evidence collected. Delving further into the nature of Arroyo's interactions with defendant would be irrelevant and prejudicial. Furthermore, the judge's curative instruction to the jury following defense counsel's objection was timely and appropriate. Jurors are expected to follow curative instructions. See State v. Manley, 54 N.J. 259, 270 (1969).

A-0976-18

II.

Defendant argues the jury instruction on identification did not include language on the factors that affect the reliability of eyewitness identification. He claims the judge should have instructed the jury to consider whether Carrasco knew defendant well enough to identify him; his opportunity to view the person he recognized as defendant inside the lounge; Carrasco's degree of attention to defendant inside the lounge; and whether viewing the surveillance video affected his identification. He asserts this prevented the jury from evaluating the reliability of Carrasco's out-of-court identification of defendant as the shooter and deprived him of a fair trial.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981). However, we will not "reverse if an erroneous jury instruction was incapable of producing an unjust result or prejudicing substantial rights." State v. Lora, 465 N.J. Super. 477, 498 (2020) (quoting Washington v. Perez, 219 N.J. 338, 351 (2014)). We review the challenged instruction in the context of the entire charge. State v. Simon, 161 N.J. 416, 477 (1999). All that is required is that the charge be accurate as a whole. State v. Baum, 224 N.J. 147, 167 (2016).

A-0976-18

"[I]nsofar as consistent with and modified to meet the facts adduced at trial, model jury charges should be followed and read in their entirety to the jury." State v. R.B., 183 N.J. 308, 325 (2005). "When a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered.'" State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)). However, it is not enough to "simply to read the applicable provision of the Criminal Code, define the terminology, and set forth the elements of the crime," but instead, the court should "mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." State v. Concepcion, 111 N.J. 373, 379 (1988).

"The appropriate time to object to a jury charge is 'before the jury retires to consider its verdict.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 1:7-2). A defendant "waives the right to contest an instruction on appeal if he does not object to the instruction." State v. Torres, 183 N.J. 554, 564 (2005) (citing R. 1:7-2). Here, because the defense did not object after the charges were read, but instead expressly agreed with them, our review is under a plain error standard. Rule 2:10-2.

22

"[W]hen eyewitness identification is a 'key issue,' the trial court must instruct the jury how to assess the evidence—even if defendant does not request the charge." Sanchez-Medina, 231 N.J. at 466 (citing State v. Cotto, 182 N.J. 316, 325 (2005)). "[A] model identification charge should be given in every case in which identification is a legitimate issue." State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003). Identification charges must provide the jury "specific instruction[s] that provide[] appropriate guidelines to focus the jury's attention on how to analyze and consider the trustworthiness of eyewitness identification." State v. Cromedy, 158 N.J. 112, 128 (1999).

Here, the trial judge proposed fashioning an identification charge based on the model charge, excluding the "human factors" relating to the reliability of identification set forth in Henderson[9] because there were no eyewitnesses to the murders. Defense counsel agreed the Henderson factors "d[id] not apply at all."

The instructions given here were proper because the jury was told to assess the reliability of the identifications through an assessment of the circumstances of the identification. Carrasco was not an eyewitness who was testifying from memory because he testified he recognized defendant by observing him inside

---

[9] In Henderson, the Court addressed the variables that affect human memory. 208 N.J. at 245-48.

the club, but did not identify defendant as the shooter until he viewed the video. Therefore, rather than focus on memory, the instructions allowed the jury to assess the reliability of Carrasco's identification inside the club and via the video. Furthermore, there was no evidence Carrasco was subject to suggestive procedures or that he knew defendant was already arrested at the time of his identification. Therefore, Henderson variables did not apply and the instruction did not constitute plain error.

## III.

Defendant argues the judge erred in ordering consecutive sentences because she relied on State v. Carey, where a defendant received consecutive sentences after he was convicted of vehicular homicide and assault by auto for striking multiple victims with his car. 168 N.J. at 419-20. Defendant argues Carey is inapplicable because the judge justified the consecutive sentences, in part, by likening a single bullet he fired striking multiple victims to the motor vehicle in Carey. Defendant also argues his sentence should be remanded to consider his youth as a mitigating factor, N.J.S.A. 2C:44-1(b)(14).

"Appellate review of a criminal sentence is limited; a reviewing court decides whether there is a 'clear showing of abuse of discretion.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512

(1979)). We will affirm the sentence unless: (1) the trial court did not follow the sentencing guidelines; (2) the aggravating and mitigating factors were not supported by the record; (3) the sentence shocks the judicial conscience. Ibid.

In Carey the Court stated: "Crimes involving multiples deaths or victims who have sustained serious bodily injuries represent especially suitable circumstances for the imposition of consecutive sentences." 168 N.J. at 428. "[T]hat principle resonates most clearly in cases in which a perpetrator intentionally targets multiple victims (e.g., a double murder or robbery) . . . ." Id. at 429. Moreover, culpability may be influenced "by the number of victims killed or caused to sustain serious bodily injuries the singular criminal event generates." Ibid.

Here, defendant fired a gun more than once. The fact that one bullet found two victims does not convince us the trial judge should have withheld a consecutive sentence because defendant did not fire at three separate targets. The trial judge did not abuse her discretion by considering the number of victims since defendant killed two people and injured a third. The sentence is sound in all other respects; the judge properly applied and analyzed the aggravating and mitigating factors and the Yarbough factors.

A-0976-18

Defendant's argument his sentence should be remanded to consider N.J.S.A. 2C:44-1(b)(14) lacks merit. This factor is applied prospectively or where a matter has been remanded for resentencing. State v. Bellamy, 468 N.J. Super. 29, 48 (App. Div. 2021).

IV.

In his pro se brief, defendant asserts there was insufficient evidence to support a conviction because there was no physical evidence linking him to the crime and the video evidence was grainy. Defendant argues the following errors cumulatively warrant a reversal: 1) Arroyo testified he could identify defendant from a DVD, but not the lounge owner's phone which contained the same footage; 2) the judge admitted the video into evidence even though the witness who transcribed it could not authenticate it; 3) the judge allowed a witness to testify who was not on the witness list; 4) the judge failed to instruct Hoornaert to answer questions in a yes or no format and permitted him to testify in narrative fashion; and 5) Rodriguez's testimony differed from his report regarding defendant's statement to Solano because Rodriguez "claims to have heard [defendant] incriminate himself, but then asked another officer to write the report."

Defendant also argues the judge erred by not granting his motion for a new trial based on newly discovered evidence regarding promises made to Hoornaert and Williams. He contends the State did not adhere to the Attorney General's directive on the reliability of jailhouse informant testimony and did not comply with its discovery obligation under the directive.

A.

Where a defendant asserts there was insufficient evidence to convict, we ask

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 459 (1967) (citing State v. Fiorella, 36 N.J. 80, 90-91 (1961)).]

"In considering circumstantial evidence, we follow an approach 'of logic and common sense. When each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole, judgment of acquittal is not warranted.'" State v. Jones, 242 N.J. 156, 168 (2020) (alteration in original) (quoting State v. Samuels, 189 N.J. 236, 246 (2007)).

27

Here, there was ample evidence to support defendant's conviction on all the charges. The State adduced testimony from over twenty witnesses, including a victim, club patrons, club employees, detectives, police officers, medical experts, identification witnesses, and jailhouse informants. The State also provided physical evidence, including defendant's clothing from the night of the incident, his sneakers, phone, and passport. Surveillance footage and stills from the video were also provided to the jury.

B.

Error that may be harmless by itself, when combined with another error, may have a "cumulative effect [that] can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). "Where the aggregation of legal errors renders a trial unfair, a new trial is required." State v. T.J.M., 220 N.J. 220, 238 (2015). A new trial is not needed however, "where no error was prejudicial[,] and the trial was fair." Ibid. (quoting State v. Weaver, 219 N.J. 131, 155 (2014)). Our Supreme Court has stated, "no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. A defendant is entitled to a fair trial but not a perfect one." Weaver, 219 N.J. at 155 (quoting State v. Wakefield, 190 N.J. 397, 537 (2007)).

28

We reject defendant's assertion there was cumulative error warranting reversal. Defendant's attack on Arroyo's testimony was a credibility issue for the jury to decide. When a witness could not authenticate the video, the State called a different witness to authenticate it. The statement Rodriguez heard and instructed Ortiz to put in his report was properly admitted as a statement by a party opponent and did not constitute reversible error.[10] Hoornaert testified in narrative fashion briefly and only once. We are unconvinced there was reversible error let alone cumulative error warranting a reversal.

## C.

"A jury verdict rendered after a fair trial should not be disturbed except for the clearest of reasons." State v. Ways, 180 N.J. 171, 187 (2004). A motion for new trial "is decided in the court's discretion in light of the credible evidence and with deference to the trial judge's feel for the case and observation of witnesses." State v. Terrell, 452 N.J. Super. 226, 268-69 (App. Div. 2016).

Newly discovered evidence warrants granting a new trial when it is:

> (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted.

---

[10] This appears to be defendant's argument the judge improperly allowed a witness to testify who was not on the witness list.

[Carter, 85 N.J. at 314.]

"A motion for a new trial upon the ground of newly discovered evidence is not favored and should be granted with caution by a trial court since it disrupts the judicial process." State v. Conway, 193 N.J. Super. 133, 171 (App. Div. 1984).

On October 9, 2020, the Attorney General issued a directive regarding the testimony of jailhouse informants, which took effect November 1, 2020. Off. of the Att'y Gen., Directive No. 2021-11, Directive Regarding Testimony of Jailhouse Informants, (2021). The directive outlines steps the prosecution must take before calling jailhouse informants as witnesses, including informing the County Prosecutor or Director of "[a]ny benefit offered or provided to a jailhouse informant, or that may be offered to the jailhouse informant in the future, in connection with the jailhouse informant's testimony against the defendant[.]" Id. at 2.

The Directive was inapplicable here because it became effective after the judge decided the motion for a new trial. Moreover, the trial judge's decision to deny defendant new trial was not error, and we affirm for the reasons expressed in the trial judge's thorough and well-reasoned opinion.

30

V.

Finally, to the extent we have not addressed an argument raised on appeal it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0976-18